## UNITED STATES *v.* PLESHA ET AL.

No. 39. Argued November 8, 1956.—Decided January 14, 1957.

*Lester S. Jayson* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub, Samuel D. Slade* and *David A. Turner.*

*Lawrence A. Schei* argued the cause for respondents. With him on the brief was *Philip C. Wilkins.*

Mr. Justice Black delivered the opinion of the Court.

Article IV of the Soldiers' and Sailors' Civil Relief Act of 1940 provided a plan under which men inducted into the armed forces would continue to receive the protection of previously purchased commercial life insurance while in the service without paying premiums.[1] Insurance companies were required to keep the policies of servicemen who elected to come under the Act in effect until one year after their military service ended even though these men made no further payments. The Government assured the insurance companies that the premiums would eventually be paid by giving its promissory certificates to the companies. The respondents, Plesha, Mabbutt, and Kern, who entered the Army in 1941, had previously purchased commercial life insurance. They invoked the benefits of the Act by filing proper applications with their companies and the Veterans' Administration. They made no further payment of premiums but the policies were kept in effect by government certificates. After leaving the Army, they were notified by the Veterans' Administration that unless they paid back premiums with interest their policies would lapse. Respondents allowed the policies to lapse and the Government paid the insuring companies the back premiums after first deducting the cash surrender value of the policies. In this case, the Government contends that it has a legal right to be reimbursed for these payments.[2] The District Court agreed with this contention. 123 F. Supp. 593. The Court of Appeals reversed, hold-

---

[1] 54 Stat. 1183, 50 U. S. C. App. (1940 ed.) § 540.

[2] Plesha brought suit against the Government to recover a dividend declared on his National Service Life Insurance policy. The Government attempted to offset the amount it had paid on his commercial insurance. The other respondents intervened to litigate the same basic issue.

ing servicemen had no statutory or contractual obliga-
tion to the Government to repay the premiums. 227
F. 2d 624.[3] We affirm the judgment below because the
language of the 1940 Act, its legislative history and its
administrative interpretation demonstrate that Congress
intended that ex-soldiers would not have to reimburse the
Government.

1. *The Act.*—As the Government concedes, the 1940
Act contained no express provision which required reim-
bursement for premiums paid by the Government on a
lapsed policy.[4] But significantly it did contain specific
provisions to reduce any losses the Government might
incur in administering the insurance plan by giving the
Government certain other rights. Under § 408 the
United States had a lien upon the policy from the time
it came under the protection of the Act. When a soldier
died the insurance company was authorized by § 409
to deduct unpaid premiums from the proceeds payable
under the policy. If after leaving the service the insured
desired to maintain his policy, § 410 required him to pay
the unpaid premiums to the insurance company. If he
chose not to pay these premiums, § 410 further provided

---

[3] We granted certiorari, 350 U. S. 1013, because this holding was in
conflict with *United States* v. *Hendler*, 225 F. 2d 106.

[4] The Government contends that such an obligation should be
implied from the Act and from general principles of the common
law—particularly the doctrine that a guarantor who pays the debt of
another is entitled to reimbursement. In regard to the common-
law right of a guarantor, we are not persuaded from the record that
the insured servicemen were indebted to the insurance companies
for the wartime premiums either under the Act or the terms of their
policies. Where no debt exists there is no basis for applying the
common-law rules of guaranty. In any event, we would be very
hesitant to infer a right to reimbursement from these servicemen in
favor of the Government based on a common-law doctrine which was
not referred to in the Act or in its congressional history. Cf. *United
States* v. *Gilman,* 347 U. S. 507.

that the policy would lapse. And if a policy lapsed, § 411 provided that the United States should be given credit for the policy's cash surrender value as an offset against the Government's promise to pay the back premiums. There was nothing that indicated that an ex-soldier had to reimburse the Government for any balance that it paid.

2. *The legislative history.*—The Government's claim for reimbursement is refuted by the legislative history. Article IV of the 1940 Act substantially reenacted the insurance provisions of the Soldiers' and Sailors' Civil Relief Act of 1918 [5] and had little independent legislative history. We agree with the Administrator of Veterans' Affairs that this scant history "is of little, if any, help" in interpreting the 1940 Act.[6] We must therefore examine the history of the 1918 bill.[7] During the Senate Committee hearings on this bill, Senator Reed, who was the principal critic of its insurance provisions, interpreted them as permitting a soldier to let his policy lapse without any obligation to restore the premiums paid by the Govern-

---

[5] 40 Stat. 444. "The only change in this article [insurance] relates to method of administration." H. R. Rep. No. 3001, 76th Cong., 3d Sess. 4.

[6] Decisions of the Administrator of Veterans' Affairs, No. 742 (April 1947), Vol. 1, Supp. 1, pp. 93, 98. The Government relies here on a discussion between Congressmen Voorhis and Arends during the House debates on the 1940 Act. 86 Cong. Rec., Part 12, 13132–13133. Apparently these gentlemen were not familiar with the specific provisions of the Act. This is not surprising since neither was a sponsor of the measure. Moreover, since the 1940 Act was a substantial reenactment of the 1918 Act, there were no committee hearings to inform congressmen of the precise scope and effect of the Act. As neither Mr. Voorhis nor Mr. Arends were lawyers, it cannot be assumed that they were aware of the technical common-law theory of guaranty which the Government relies on here. We think the Veterans' Administrator was correct in concluding that the legislative history, which includes the Voorhis-Arends colloquy, "is of little, if any, help" to the Government's claim.

[7] See *Boone* v. *Lightner,* 319 U. S. 561, 565.

ment.[8]  He objected to the Government's bearing any part
of the cost and even suggested that the bill should be
amended to authorize the Government to deduct the
premiums from the soldier's monthly pay.   Professor
John H. Wigmore, who as a major representing the Army
had a dominant part in drafting the bill and presenting
it to Congress, strongly objected to Senator Reed's sug-
gestions.   Professor Wigmore pointed out that this benefit
would be in keeping with the many new benefits which
were being conferred on servicemen at that critical war
period.   When directly asked whether a soldier could be
made to pay, he called attention to the fact that the
Government had a lien on the policy and could recover
the cash surrender value.   He admitted, however, that
the cash surrender value would not in all cases pay the
entire amount of back premiums but predicted that
the loss to the Government would be very slight.[9]   The

---

[8] "If he comes back and wants to keep his insurance in effect,
I take it the proposition here is that he must then pay the Govern-
ment; but if he does not want to keep this policy in effect he still
has the option to walk away and leave it." Hearings before the
Subcommittee of the Senate Committee on the Judiciary on S. 2859
and H. R. 6361, 65th Cong., 1st and 2d Sess. 135.

[9] In closing the argument over requiring the soldiers to pay, the fol-
lowing colloquy took place between Major Wigmore and Senator Reed:
"Senator Reed: . . . Now, do you think that would be undesirable,
Major, or do you think it would be greatly to be preferred that the
Government just carry the risk?
"Maj. Wigmore: I can only speak for myself in that respect; but,
speaking from my own judgment, it would seem to me that that is
going further than this Nation ought to wish to go against its soldiers
and sailors. . . .
"Senator Reed: . . . You really think it is desirable that the Gov-
ernment should carry it, regardless of the attempt to reimburse
itself out of the man's pay?
"Maj. Wigmore: I only want to point out the fact that the Govern-
ment, in the war-risk insurance bill . . . has offered to give Govern-
ment insurance to soldiers and sailors at a rate of, I think, $8 a

Committee accepted Professor Wigmore's position and reported the bill in the form he urged.

The House Judiciary Committee made a comprehensive report on the 1918 bill.[10]   It referred to the insurance sections as providing a method for the Government to "carry" the premiums upon servicemen's policies in private companies.   The Committee recognized that carrying this insurance would cost the Government money, but expressed the hope that this burden would not be large because:

> "In the first place the Government only guarantees the payment of the premiums.   If the soldier dies the insurance company will get its premiums out of the policy and the Government's guaranty will not be called upon.   If the soldier comes back from the war he will repay the premiums if he continues the policy, and if he lets the policy lapse the Government will be subrogated to his rights." [11]

Thus, the Committee apparently thought that the Government must look to the cash surrender value to mitigate its loss where a policy was allowed to lapse.

In 1942, the 1940 Act was amended to require ex-servicemen to reimburse the Government for back premiums paid by it on their lapsed policies.[12]   The Government

---

thousand, which I am told means that the Government pays the entire expenses of administration of that insurance . . . .   They have therefore contributed that already to soldiers and sailors in providing insurance.   If the Government has gone that far, it seems to me it would be inconsistent with that, in principle, not to go this far." *Id.*, at 137–138.

[10] H. R. Rep. No. 181, 65th Cong., 1st Sess.

[11] *Id.*, at 8.

[12] "The amount paid by the United States to an insurer on account of applications approved under the provisions of this article, *as amended,* shall become a debt due to the United States by the insured on whose account payment was made . . . ."   (Emphasis added.) 56 Stat. 775.

contends that this 1942 Amendment was to clarify and reaffirm the meaning of the 1940 Act. However it appears that the Veterans' Administration requested the 1942 Amendment to ". . . eliminate the possibility of requiring the Government to pay premiums on insurance which the insured does not intend to carry except during his period of active service . . . ." [13] And during a hearing before the House Committee on Military Affairs a Veterans' Administration representative testified, "[t]he insured is liable for all of the premiums of the $5,000 policy, the Government acting really as a guarantor. However, if there is a default [by the ex-serviceman], there would not be any liability for the whole amount, in excess of the cash [surrender] value under present construction of existing law." [14] If the legislative history of the 1942 Act indicates anything, it is that Congress thought that it was changing the law by changing the language of the Act.[15]

3. *The administrative interpretation.*—The administration of the 1918 and 1940 Acts does not support the Government's claim for reimbursement. The Govern-

---

[13] Letter of the Veterans' Administrator to the President of the Senate, appended to S. Rep. No. 716, 77th Cong., 1st Sess. 6.

[14] Hearings before the House Committee on Military Affairs on H. R. 7029, 77th Cong., 2d Sess. 38.

[15] Even the Veterans' Administration stated in a formal decision in 1947 that:

"Fairness compels admission that the legislative history of the 1942 act reflects a probable belief, though an incorrect one, on the part of the Seventy-seventh Congress that the 1940 act (passed by the Seventy-sixth Congress) had been construed as not giving rise to a debt owing by the insured to the Government upon the latter's payment to the insurer of the amount by which the premiums with interest exceeded the cash surrender value." Decisions of the Administrator of Veterans' Affairs, No. 742 (April 1947), Vol. 1, Supp. 1, pp. 93, 103.

ment relies on the fact that a few soldiers who invoked the protection of the 1918 Act and allowed their policies to lapse were later required to reimburse it. However these collections were so sporadic and so insignificant that instead of supporting the Government's position they contradict it.[16]  Under the 1940 Act, § 401 (2) required the Veterans' Administration to issue notices explaining the Act. None of the notices promulgated prior to 1943 suggested any duty on the part of servicemen to reimburse the Government.[17]  But public statements of Veterans' Administration officials gave the Act a squarely contrary construction.[18]

---

[16] According to the Government's figures, 7,745 policies were brought within the protection of the 1918 Act; 476 of these policies were allowed to lapse. The total amount of back premiums paid by the Government on these policies was less than $20,000 or approximately $42 per policy, showing that Major Wigmore's prophecy as to the smallness of the Government's losses was a correct one. The Government sought reimbursement on only 10 of these 476 lapsed policies and total collections were $484.42. Records submitted show that all collections were obtained from soldiers who were still in the Army at the time they were called on to pay. The demands for payment went through regular military channels.

[17] Apparently the first time the Veterans' Administration ever officially interpreted the Act as authorizing the Government to be reimbursed for its payment of premiums on lapsed policies was in Administrator's Decision No. 513, March 1, 1943. This decision held that the Government's agreement to carry policies under the 1940 Act was a "gratuitous assumption of liability" which had been retroactively changed by the 1942 Amendment. Decisions of the Administrator of Veterans' Affairs, No. 513 (March 1943), Vol. 1, 781. However we agree with the view expressed in a later Administrator's Decision, No. 742, that a serviceman's liability under the 1940 Act must be determined under it and not under the 1942 Act. And see *Lynch* v. *United States*, 292 U. S. 571.

[18] Less than two months after the 1940 Act was passed, the Director of Insurance for the Veterans' Administration replying to a telegraphic inquiry stated that "No provision is made in the Act for

Section 401 (1) required soldiers seeking the benefit of the 1940 Act to file applications on forms prepared in accordance with the regulations of the Veterans' Administration. The respondents here filed such an application which included within its terms the following agreement:

> "In consideration hereof, I hereby consent and agree that the United States shall be protected in the amount of any premiums and interest guaranteed on the above numbered policy in the event of its maturity as a claim, or out of the cash surrender value of the policy, at the expiration of the period of protection under the Act."

This contract, prepared by the Veterans' Administration, contained no suggestion to soldiers that they would be expected to reimburse the Government for its payment of premiums if they permitted their policies to lapse. Had the Veterans' Administration construed the Act as imposing such a liability on soldiers, we think it would have mentioned the obligation in the contract that it asked them to sign.

Congress passed the 1918 and 1940 Acts at a time when men were being called from civilian life into the Army in the face of impending war. Great efforts were made to ease the burden on these men and their dependents.

---

collecting from insured the amount paid by Government to insurer." Shortly afterwards the Director made a similar statement to an insurance company representative.

In the meantime the Assistant Director made the following statement for publication in an insurance journal: "There is no provision in the Act at this time for collecting from the insured the amount that the premium with interest may exceed the cash surrender value at the time of termination." This same interpretation was given by the Assistant Director when testifying before the House Committee on Military Affairs in favor of the 1942 Amendment. See text at n. 14, *supra*.

Among these, the Government generously provided family allotments, disability payments, and low-cost government insurance. Similarly the provisions under consideration here were adopted to assist soldiers who had bought insurance before entering the Army and did not require them to reimburse the Government.

*Affirmed.*

MR. JUSTICE FRANKFURTER, MR. JUSTICE BURTON and MR. JUSTICE HARLAN dissent for the reasons given by Circuit Judge Huxman in *United States* v. *Hendler,* 225 F. 2d 106.