KENT ET AL. *v.* DULLES, SECRETARY OF STATE.

No. 481.   Argued April 10, 1958.—Decided June 16, 1958.

*Leonard B. Boudin* argued the cause for petitioners. With him on the brief were *Victor Rabinowitz* and *David Rein.* *Daniel G. Marshall* was also on the brief for Briehl, petitioner.

*Solicitor General Rankin* argued the cause for respondent. With him on the brief were *Assistant Attorney General Doub, Samuel D. Slade* and *B. Jenkins Middleton.*

*Osmond K. Fraenkel* and *William J. Butler* filed a brief for the American Civil Liberties Union, as *amicus curiae.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case concerns two applications for passports, denied by the Secretary of State. One was by Rockwell Kent who desired to visit England and attend a meeting of an organization known as the "World Council of Peace" in Helsinki, Finland. The Director of the Passport Office informed Kent that issuance of a passport was precluded by § 51.135 of the Regulations promulgated by the Secretary of State on two grounds: [1] (1) that he was a

---

[1] 22 CFR § 51.135 provides:

"In order to promote the national interest by assuring that persons who support the world Communist movement of which the Communist Party is an integral unit may not, through use of United

Communist and (2) that he had had "a consistent and prolonged adherence to the Communist Party line." The letter of denial specified in some detail the facts on which those conclusions were based. Kent was also advised of his right to an informal hearing under § 51.137 of the Regulations. But he was also told that whether or not a hearing was requested it would be necessary, before a. passport would be issued, to submit an affidavit as to whether he was then or ever had been a Communist.[2] Kent did not ask for a hearing but filed a new passport application listing several European countries he desired to visit. When advised that a hearing was still available to him, his attorney replied that Kent took the position

States passports, further the purposes of that movement, no passport, except one limited for direct and immediate return to the United States, shall be issued to:

"(a) Persons who are members of the Communist Party or who have recently terminated such membership under such circumstances as to warrant the conclusion—not otherwise rebutted by the evidence—that they continue to act in furtherance of the interests and under the discipline of the Communist Party;

"(b) Persons, regardless of the formal state of their affiliation with the Communist Party, who engage in activities which support the Communist movement under such circumstances as to warrant the conclusion—not otherwise rebutted by the evidence—that they have engaged in such activities as a result of direction, domination, or control exercised over them by the Communist movement;

"(c) Persons, regardless of the formal state of their affiliation with the Communist Party, as to whom there is reason to believe, on the balance of all the evidence, that they are going abroad to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement."

[2] Section 51.142 of the Regulations provides:

"At any stage of the proceedings in the Passport Division or before the Board, if it is deemed necessary, the applicant may be required, as a part of his application, to subscribe, under oath or affirmation, to a statement with respect to present or past membership in the Communist Party. If applicant states that he is a Communist, refusal of a passport in his case will be without further proceedings."

that the requirement of an affidavit concerning Communist Party membership "is unlawful and that for that reason and as a matter of conscience," he would not supply one. He did, however, have a hearing at which the principal evidence against him was from his book It's Me O Lord, which Kent agreed was accurate. He again refused to submit the affidavit, maintaining that any matters unrelated to the question of his citizenship were irrelevant to the Department's consideration of his application. The Department advised him that no further consideration of his application would be given until he satisfied the requirements of the Regulations.

Thereupon Kent sued in the District Court for declaratory relief. The District Court granted summary judgment for respondent. On appeal the case of Kent was heard with that of Dr. Walter Briehl, a psychiatrist. When Briehl applied for a passport, the Director of the Passport Office asked him to supply the affidavit covering membership in the Communist Party. Briehl, like Kent, refused. The Director then tentatively disapproved the application on the following grounds:

"In your case it has been alleged that you were a Communist. Specifically it is alleged that you were a member of the Los Angeles County Communist Party; that you were a member of the Bookshop Association, St. Louis, Missouri; that you held Communist Party meetings; that in 1936 and 1941 you contributed articles to the Communist Publication 'Social Work Today'; that in 1939, 1940 and 1941 you were a sponsor to raise funds for veterans of the Abraham Lincoln Brigade in calling on the President of the United States by a petition to defend the rights of the Communist Party and its members; that you contributed to the Civil Rights Congress bail fund to be used in raising bail on behalf of convicted Communist leaders in New York City; that

you were a member of the Hollywood Arts, Sciences and Professions Council and a contact of the Los Angeles Committee for Protection of Foreign Born and a contact of the Freedom Stage, Incorporated."

The Director advised Briehl of his right to a hearing but stated that whether or not a hearing was held, an affidavit concerning membership in the Communist Party would be necessary. Briehl asked for a hearing and one was held. At that hearing he raised three objections: (1) that his "political affiliations" were irrelevant to his right to a passport; (2) that "every American citizen has the right to travel regardless of politics"; and (3) that the burden was on the Department to prove illegal activities by Briehl. Briehl persisted in his refusal to supply the affidavit. Because of that refusal Briehl was advised that the Board of Passport Appeals could not under the Regulations entertain an appeal.

Briehl filed his complaint in the District Court which held that his case was indistinguishable from Kent's and dismissed the complaint.

The Court of Appeals heard the two cases *en banc* and affirmed the District Court by a divided vote. 101 U. S. App. D. C. 278, 239, 248 F. 2d 600, 561. The cases are here on writ of certiorari. 355 U. S. 881.

The Court first noted the function that the passport performed in American law in the case of *Urtetiqui* v. *D'Arbel*, 9 Pet. 692, 699, decided in 1835:

"There is no law of the United States, in any manner regulating the issuing of passports, or directing upon what evidence it may be done, or declaring their legal effect. It is understood, as matter of practice, that some evidence of citizenship is required, by the secretary of state, before issuing a passport. This, however, is entirely discretionary

with him. No inquiry is instituted by him to ascertain the fact of citizenship, or any proceedings had, that will in any manner bear the character of a judicial inquiry. It is a document, which, from its nature and object, is addressed to foreign powers; purporting only to be a request, that the bearer of it may pass safely and freely; and is to be considered rather in the character of a political document, by which the bearer is recognized, in foreign countries, as an American citizen; and which, by usage and the law of nations, is received as evidence of the fact."

A passport not only is of great value—indeed necessary—abroad; it is also an aid in establishing citizenship for purposes of re-entry into the United States. See *Browder* v. *United States,* 312 U. S. 335, 339; 3 Moore, Digest of International Law (1906), § 512. But throughout most of our history—until indeed quite recently—a passport, though a great convenience in foreign travel, was not a legal requirement for leaving or entering the United States. See Jaffe, The Right to Travel: The Passport Problem, 35 Foreign Affairs 17. Apart from minor exceptions to be noted, it was first[3] made a requirement by § 215 of the Act of June 27, 1952, 66 Stat. 190, 8 U. S. C. § 1185, which states that, after a prescribed proclamation by the President, it is "unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United

---

[3] Sections 2 and 6 of the Act of September 23, 1950, known as the Internal Security Act of 1950, 64 Stat. 987, 993, 50 U. S. C. §§ 781, 785, provide that it shall be unlawful, when a Communist organization is registered under the Act or when "there is in effect a final order of the Board requiring an organization to register," for any member having knowledge of such registry and order to apply for a passport or for any official to issue him one. But the conditions precedent have not yet materialized.

States unless he bears a valid passport." [4] And the Proclamation necessary to make the restrictions of this Act applicable and in force has been made.[5]

Prior to 1952 there were numerous laws enacted by Congress regulating passports and many decisions, rulings, and regulations by the Executive Department concerning them. Thus in 1803 Congress made it unlawful for an official knowingly to issue a passport to an alien certifying that he is a citizen. 2 Stat. 205. In 1815, just prior to the termination of the War of 1812, it made it illegal for a citizen to "cross the frontier" into enemy

---

[4] That section provides in relevant part:

"(a) When the United States is at war or during the existence of any national emergency proclaimed by the President, . . . and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful—

"(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;

.            .            .            .            .

"(3) for any person knowingly to make any false statement in an application for permission to depart from or enter the United States with intent to induce or secure the granting of such permission either for himself or for another;

.            .            .            .            .

"(b) After such proclamation as is provided for in subsection (a) has been made and published and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

[5] Proc. No. 3004, 67 Stat. C31.

territory, to board vessels of the enemy on waters of the United States or to visit any of his camps within the limits of the United States, "without a passport first obtained" from the Secretary of State or other designated official. 3 Stat. 199–200. The Secretary of State took similar steps during the Civil War. See Dept. of State, The American Passport (1898), 50. In 1850 Congress ratified a treaty with Switzerland requiring passports from citizens of the two nations. 11 Stat. 587, 589–590. Finally in 1856 Congress enacted what remains today as our basic passport statute. Prior to that time various federal officials, state and local officials, and notaries public had undertaken to issue either certificates of citizenship or other documents in the nature of letters of introduction to foreign officials requesting treatment according to the usages of international law. By the Act of August 18, 1856, 11 Stat. 52, 60–61, 22 U. S. C. § 211a, Congress put an end to those practices.[6] This provision, as codified by the Act of July 3, 1926, 44 Stat., Part 2, 887, reads,

> "The Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

Thus for most of our history a passport was not a condition to entry or exit.

It is true that, at intervals, a passport has been required for travel. Mention has already been made of the restrictions imposed during the War of 1812 and during the Civil War. A like restriction, which was the forerunner of that contained in the 1952 Act, was imposed by Congress in 1918.

---

[6] See 9 Op. Atty. Gen. 350, 352.

The Act of May 22, 1918, 40 Stat. 559, made it unlawful, while a Presidential Proclamation was in force, for a citizen to leave or enter the United States "unless he bears a valid passport." See H. R. Rep. No. 485, 65th Cong., 2d Sess. That statute was invoked by Presidential Proclamation No. 1473 on August 8, 1918, 40 Stat. 1829, which continued in effect until March 3, 1921. 41 Stat. 1359.

The 1918 Act was effective only in wartime. It was amended in 1941 so that it could be invoked in the then-existing emergency. 55 Stat. 252. See S. Rep. No. 444, 77th Cong., 1st Sess. It was invoked by Presidential Proclamation No. 2523, November 14, 1941, 55 Stat. 1696. That emergency continued until April 28, 1952. Proc. No. 2974, 66 Stat. C31. Congress extended the statutory provisions until April 1, 1953. 66 Stat. 54, 57, 96, 137, 330, 333. It was during this extension period that the Secretary of State issued the Regulations here complained of.[7]

Under the 1926 Act and its predecessor a large body of precedents grew up which repeat over and again that the issuance of passports is "a discretionary act" on the part of the Secretary of State. The scholars,[8] the courts,[9] the Chief Executive,[10] and the Attorneys General,[11] all

---

[7] Dept. Reg. No. 108.162, effective August 28, 1952, 17 Fed. Reg. 8013.

[8] See 2 Hyde, International Law (2d rev. ed. 1945), § 399; 3 Hackworth, Digest of International Law (1942), § 268.

[9] See *Perkins* v. *Elg*, 307 U. S. 325, 350.

[10] Exec. Order No. 654, June 13, 1907; *id.*, No. 2119–A, Jan. 12, 1915; *id.*, No. 2286–A, Dec. 17, 1915; *id.*, No. 2362–A, Apr. 17, 1916; *id.*, No. 2519–A, Jan. 24, 1917; *id.*, No. 4382–A, Feb. 12, 1926; *id.*, No. 4800, Jan. 31, 1928; *id.*, No. 5860, June 22, 1932; *id.*, No. 7856, Mar. 31, 1938, 3 Fed. Reg. 681, 22 CFR § 51.75. The present provision is that last listed and reads in part as follows:

"The Secretary of State is authorized in his discretion to refuse to issue a passport, to restrict a passport for use only in certain

so said.  This long-continued executive construction should be enough, it is said, to warrant the inference that Congress had adopted it.  See *Allen* v. *Grand Central Aircraft Co.*, 347 U. S. 535, 544–545; *United States* v. *Allen-Bradley Co.*, 352 U. S. 306, 310.  But the key to that problem, as we shall see, is in the manner in which the Secretary's discretion was exercised, not in the bare fact that he had discretion.

The right to travel is a part of the "liberty" of which the citizen cannot be deprived without due process of law under the Fifth Amendment.  So much is conceded by the Solicitor General.  In Anglo-Saxon law that right was emerging at least as early as the Magna Carta.[12]  Chafee,

---

countries, to restrict it against use in certain countries, to withdraw or cancel a passport already issued, and to withdraw a passport for the purpose of restricting its validity or use in certain countries."

The Department, however, did not feel that the Secretary of State could exercise his discretion willfully without cause.  Acting Secretary Wilson wrote on April 27, 1907, "The issuance of passports is a discretionary act on the part of the Secretary of State, and he may, for reasons deemed by him to be sufficient, direct the refusal of a passport to an American citizen; but a passport is not to be refused to an American citizen, even if his character is doubtful, unless there is reason to believe that he will put the passports to an improper or unlawful use."  Foreign Relations of the United States, Pt. II (1910), 1083.  See 3 Moore, Digest of International Law (1906), § 512.  Freund, Administrative Powers over Persons and Property (1928), 97, states ". . . in practice it is clear that the Department of State acts upon the theory that it must grant the passport unless there is some circumstance making it a duty to refuse it.  Any other attitude would indeed be intolerable; it would mean an executive power of a political character over individuals quite out of harmony with traditional American legislative practice."

[11] 13 Op. Atty. Gen. 89, 92; 23 Op. Atty. Gen. 509, 511.

[12] Article 42 reads as follows:

"It shall be lawful to any person, for the future, to go out of our kingdom, and to return, safely and securely, by land or by water, saving his allegiance to us, unless it be in time of war, for some short space, for the common good of the kingdom: excepting prisoners

Three Human Rights in the Constitution of 1787 (1956), 171–181, 187 *et seq.*, shows how deeply engrained in our history this freedom of movement is. Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values. See *Crandall* v. *Nevada,* 6 Wall. 35, 44; *Williams* v. *Fears,* 179 U. S. 270, 274; *Edwards* v. *California,* 314 U. S. 160. "Our nation," wrote Chafee, "has thrived on the principle that, outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases." *Id.,* at 197.

Freedom of movement also has large social values. As Chafee put it:

> "Foreign correspondents and lecturers on public affairs need first-hand information. Scientists and scholars gain greatly from consultations with colleagues in other countries. Students equip themselves for more fruitful careers in the United States by instruction in foreign universities.[13] Then there are reasons close to the core of personal life—marriage, reuniting families, spending hours with old friends. Finally, travel abroad enables American citizens to understand that people like themselves live in Europe and helps them to be well-informed

---

and outlaws, according to the laws of the land, and of the people of the nation at war against us, and Merchants who shall be treated as it is said above." And see Jaffe, *op. cit. supra,* 19–20; Sibley, The Passport System, 7 J. Soc. Comp. Leg. (N. S.) 26, 32–33; 1 Blackstone Commentaries 134–135.

[13] The use of foreign travel to promote educational interests is reviewed by Francis J. Colligan in 30 Dept. State Bull. 663.

on public issues. An American who has crossed the ocean is not obliged to form his opinions about our foreign policy merely from what he is told by officials of our government or by a few correspondents of American newspapers. Moreover, his views on domestic questions are enriched by seeing how foreigners are trying to solve similar problems. In many different ways direct contact with other countries contributes to sounder decisions at home." *Id.*, at 195–196. And see Vestal, Freedom of Movement, 41 Iowa L. Rev. 6, 13–14.

Freedom to travel is, indeed, an important aspect of the citizen's "liberty." We need not decide the extent to which it can be curtailed. We are first concerned with the extent, if any, to which Congress has authorized its curtailment.

The difficulty is that while the power of the Secretary of State over the issuance of passports is expressed in broad terms, it was apparently long exercised quite narrowly. So far as material here, the cases of refusal of passports generally fell into two categories. First, questions pertinent to the citizenship of the applicant and his allegiance to the United States had to be resolved by the Secretary, for the command of Congress was that "No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States." 32 Stat. 386, 22 U. S. C. § 212. Second, was the question whether the applicant was participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States. See 3 Moore, Digest of International Law (1906), § 512; 3 Hackworth, Digest of International Law (1942), § 268; 2 Hyde, International Law (2d rev. ed.), § 401.

The grounds for refusal asserted here do not relate to citizenship or allegiance on the one hand or to criminal or unlawful conduct on the other. Yet, so far as relevant here, those two are the only ones which it could fairly be argued were adopted by Congress in light of prior administrative practice. One can find in the records of the State Department rulings of subordinates covering a wider range of activities than the two indicated. But as respects Communists these are scattered rulings and not consistently of one pattern. We can say with assurance that whatever may have been the practice after 1926, at the time the Act of July 3, 1926, was adopted, the administrative practice, so far as relevant here, had jelled only around the two categories mentioned. We, therefore, hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose.

More restrictive regulations were applied in 1918 and in 1941 as war measures. We are not compelled to equate this present problem of statutory construction with problems that may arise under the war power. Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579.

In a case of comparable magnitude, *Korematsu v. United States,* 323 U. S. 214, 218, we allowed the Government in time of war to exclude citizens from their homes and restrict their freedom of movement only on a showing of "the gravest imminent danger to the public safety." There the Congress and the Chief Executive moved in coordinated action; and, as we said, the Nation was then at war. No such condition presently exists. No such showing of extremity, no such showing of joint action by the Chief Executive and the Congress to curtail a constitutional right of the citizen has been made here.

Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it. If we were dealing with political questions entrusted to the Chief Executive by the Constitution we would have a different case. But there is more involved here. In part, of course, the issuance of the passport carries some implication of intention to extend the bearer diplomatic protection, though it does no more than "request all whom it may concern to permit safely and freely to pass, and in case of need to give all lawful aid and protection" to this citizen of the United States. But that function of the passport is subordinate. Its crucial function today is control over exit. And, as we have seen, the right of exit is a personal right included within the word "liberty" as used in the Fifth Amendment. If that "liberty" is to be regulated, it must be pursuant to the law-making functions of the Congress. *Youngstown Sheet & Tube Co.* v. *Sawyer, supra.* And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests. See *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 420–430. Cf. *Cantwell* v. *Connecticut,* 310 U. S. 296, 307; *Niemotko* v. *Maryland,* 340 U. S. 268, 271. Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them. See *Ex parte Endo,* 323 U. S. 283, 301–302. Cf. *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, 156; *United States* v. *Rumely,* 345 U. S. 41, 46. We hesitate to find in this broad generalized power an authority to trench so heavily on the rights of the citizen.

Thus we do not reach the question of constitutionality. We only conclude that § 1185 and § 211a do not delegate to the Secretary the kind of authority exercised here.

We deal with beliefs, with associations, with ideological matters. We must remember that we are dealing here with citizens who have neither been accused of crimes nor found guilty. They are being denied their freedom of movement solely because of their refusal to be subjected to inquiry into their beliefs and associations. They do not seek to escape the law nor to violate it. They may or may not be Communists. But assuming they are, the only law which Congress has passed expressly curtailing the movement of Communists across our borders has not yet become effective.[14] It would therefore be strange to infer that pending the effectiveness of that law, the Secretary has been silently granted by Congress the larger, the more pervasive power to curtail in his discretion the free movement of citizens in order to satisfy himself about their beliefs or associations.

To repeat, we deal here with a constitutional right of the citizen, a right which we must assume Congress will be faithful to respect. We would be faced with important constitutional questions were we to hold that Congress by § 1185 and § 211a had given the Secretary authority to withhold passports to citizens because of their beliefs or associations. Congress has made no such provision in explicit terms; and absent one, the Secretary may not employ that standard to restrict the citizens' right of free movement.

*Reversed.*

MR. JUSTICE CLARK, with whom MR. JUSTICE BURTON, MR. JUSTICE HARLAN, and MR. JUSTICE WHITTAKER concur, dissenting.

On August 28, 1952, acting under authority vested by Executive Order No. 7856, 22 CFR § 51.77, the Secretary of State issued the regulations in question, § 51.142 of

---

[14] See note 3, *supra.*

which provides that a passport applicant may be required to make a statement under oath "with respect to present or past membership in the Communist Party." 22 CFR § 51.142. Since 1917, the Congress has required that every passport application "contain a true recital of each and every matter of fact which may be required by . . . any rules" of the Secretary of State, and that requirement must be satisfied "[b]efore a passport is issued to any person." 40 Stat. 227, 22 U. S. C. § 213. In the context of that background, the Secretary asked for, and petitioners refused to file, affidavits stating whether they then were or ever had been members of the Communist Party. Thereupon the Secretary refused to further consider petitioners' applications until such time as they filed the required affidavits.

The Secretary's action clearly must be held authorized by Congress if the requested information is relevant to any ground upon which the Secretary might properly refuse to issue a passport. The Court purports today to preclude the existence of such a ground by holding that the Secretary has not been authorized to deny a passport to a Communist whose travel abroad would be inimical to our national security.

In thus construing the authority of the Secretary, the Court recognizes that all during our history he has had discretion to grant or withhold passports. That power, first exercised without benefit of statute, was made the subject of specific legislative authority in 1856 when the Congress consolidated all power over passports in the hands of the Secretary. 11 Stat. 60–61. In 1874 the statutory language, "shall be authorized to grant and issue," was changed to "may grant and issue." 1874 R. S. § 4075. In slightly modified form, the Secretary's power has come through several re-enactments, *e. g.,* 44 Stat., Part 1, p. 657 in 1926, to its present-day embodiment in 44 Stat., Part 2, p. 887, 22 U. S. C. § 211a.

This discretionary authority, which we previously acknowledged in *Perkins* v. *Elg,* 307 U. S. 325, 349–350 (1939), was exercised both in times of peace and in periods of war. During war and other periods of national emergency, however, the importance of the Secretary's passport power was tremendously magnified by a succession of "travel-control statutes" making possession of a passport a legal necessity to leaving or entering this country. The first of these was enacted in 1815 just prior to the end of the War of 1812, when it was made illegal for any citizen to "cross the frontier" into enemy territory without a passport. 3 Stat. 199. After the same result was accomplished during the Civil War without congressional sanction, 3 Moore, Digest of International Law, 1015–1021, World War I prompted passage in 1918 of the second travel-control statute, 40 Stat. 559. The 1918 statute, directly antecedent to presently controlling legislation, provided that in time of war and upon public proclamation by the President that the public safety required additional travel restrictions, no citizen could depart from or enter into the country without a passport. Shortly thereafter, President Wilson made the required proclamation of public necessity, and provided that no citizen should be granted a passport unless it affirmatively appeared that his "departure or entry is not prejudicial to the interests of the United States." Proc. No. 1473, 40 Stat. 1829.

The legislative history of the 1918 Act sharply indicates that Congress meant the Secretary to deny passports to those whose travel abroad would be contrary to our national security. The Act came to the floor of the House of Representatives accompanied by the following explanation in the Report of the House Committee on Foreign Affairs, H. R. Rep. No. 485, 65th Cong., 2d Sess. 2–3:

> "That some supervision of travel by American citizens is essential appeared from statements made

before the committee at the hearing upon the bill. One case was mentioned of a United States citizen who recently returned from Europe after having, to the knowledge of our Government, done work in a neutral country for the German Government. There was strong suspicion that he came to the United States for no proper purpose. Nevertheless not only was it impossible to exclude him but it would now be impossible to prevent him from leaving the country if he saw fit to do so. The known facts in his case are not sufficient to warrant the institution of a criminal prosecution, and in any event the difficulty of securing legal evidence from the place of his activities in Europe may easily be imagined.

.      .      .      .      .

"It is essential to meet the situation that the Executive should have wide discretion and wide authority of action. No one can foresee the different means which may be adopted by hostile nations to secure military information or spread propaganda and discontent. It is obviously impracticable to appeal to Congress for further legislation in each new emergency. Swift Executive action is the only effective counterstroke.

"The committee was informed by representatives of the executive departments that the need for prompt legislation of the character suggested is most pressing. There have recently been numerous suspicious departures for Cuba which it was impossible to prevent. Other individual cases of entry and departure at various points have excited the greatest anxiety. This is particularly true in respect of the Mexican border, passage across which can not legally be restricted for many types of persons reasonably suspected of aiding Germany's purposes."

During debate of the bill on the floor of the House, its House spokesman stated:

"The Government is now very much hampered by lack of authority to control the travel to and from this country, even of people suspected of not being loyal, and even of those whom they suspect of being in the employ of enemy governments." 56 Cong. Rec. 6029.

.       .       .       .       .

"Our ports are open, so far as the law is concerned, to alien friends, citizens, and neutrals, to come and go at will and pleasure, and that notwithstanding the Government may suspect the conduct and the intention of the individuals who come and go." *Id.* at 6065.

His counterpart in the Senate stated in debate:

"The chief object of the bill is to correct a very serious trouble which the Department of State, the Department of Justice, and the Department of Labor are having with aliens and alien enemies and rene-gade American citizens, I am sorry to say, entering the United States from nests they have in Cuba and over the Mexican border. They can now enter and depart without any power of the departments or of the Government to intercept or delay them. There is no law that covers this case. It is believed that all the information which goes to Germany of the war preparations of the United States and of the transportation of troops to France passes through Mexico. The Government is having a great deal of trouble along that border. It is an everyday occur-rence, and the emergency of this measure is very great. The bill is supplementary to the espionage

> laws and necessary for their efficient execution in detecting and punishing German spies." 56 Cong. Rec. 6192.

The implication is unmistakable that the Secretary was intended to exercise his traditional passport function in such a manner as would effectively add to the protection of this country's internal security.

That the Secretary so understood and so exercised his passport power in this period is evident from two State Department documents in 1920. A memorandum of the Under Secretary of State, dated November 30, 1920, declared, "Any assistance in the way of passport facilities, which this Government may render to a person who is working either directly or indirectly in behalf of the Soviet Government is a help to the Soviet Government . . . ." Memorandum Re Applicants for Passports Who are Bolshevists or Who are Connected with Bolshevist Government, Code No. 5000. Accordingly, it was recommended that passports be refused any person "who counsels or advocates publicly or privately the overthrow [of] organized Governments by force." *Id.* Among the examples stated were "[m]embers of the Communist Party." *Id.* Two weeks later, the State Department published office instructions, dated December 16, 1920, to our embassies throughout the world, implementing Code No. 5000 by prohibiting issuance of passports to "anarchists" and "revolutionary radicals." Expressly included among the proscribed classes of citizens were those who "believe in or advocate the overthrow by force or violence of the Government of the United States," as well as all those who "are members of or are affiliated with any organization" that believes in or advocates such overthrow.

By its terms a war statute, the 1918 Act expired in March 1921, see 41 Stat. 1359, after which no more travel

controls existed until 1941. In that year, Congress amended the 1918 Act so as to provide the same controls during the national emergency proclaimed by the President on May 27, 1941, should the President find and publicly proclaim that the interest of the United States required that such restrictions be reimposed. 55 Stat. 252. Shortly thereafter, President Roosevelt invoked this authority, 55 Stat. 1696, and implementing regulations were issued by the State Department. 22 CFR § 53. The legislative history of the 1941 amendment is as clear as that of the 1918 Act: the purpose of the legislation was to so use the passport power of the Secretary as to block travel to and from the country by those persons whose passage would not be in the best interests and security of the United States. The Report of the Senate Committee on the Judiciary, S. Rep. No. 444, 77th Cong., 1st Sess. 1–2, declared:

> "Since the outbreak of the present war it has come to the attention of the Department of State and of other executive departments that there are many persons in and outside of the United States who are directly engaged in espionage and subversive activities in the interests of foreign governments, and others who are engaged in activities inimical to the best interests of the United States, who desire to travel from time to time between the United States and foreign countries in connection with their activities . . . ."

During debate on the House floor, the "sole purpose" of the bill was stated to be establishment of "a sort of clearing house," where those persons wishing to enter or leave the country "would have to give their reasons why they were going or coming, and where it would be determined whether . . . their coming in or going out would be inimical to the interests of the United States." 87

Cong. Rec. 5052. See also 87 Cong. Rec. 5048–5053, 5386–5388. The carrying out of this legislative purpose resulted in a "complete change in emphasis of the work of the Division from that of an agency to afford protection to the individual to that of one whose principal purpose was to safeguard and maintain the security of the state." 12 Dept. State Bull. 1070. That transformation involved "the clearance *upon a basis of security for the state* of the entry and departure of hundreds of thousands of persons into and from the United States." *Id.* (Emphasis added.)

While the national emergency to which the 1941 amendment related was officially declared at an end on April 28, 1952, Proc. No. 2974, 66 Stat. C31, Congress continued the provisions of the Act in effect until April 1, 1953. 66 Stat. 54. In that interim period, Congress passed the Immigration and Nationality Act of 1952, which both repealed the 1918 Act as amended in 1941, 66 Stat. 279, and re-enacted it as § 215 of the 1952 Act, amending it only to the extent that its provisions would be subject to invocation "during the existence of any national emergency proclaimed by the President." 66 Stat. 190. There is practically no legislative history on this incorporation of the 1918 statute in the 1952 Act apart from a comment in the House Report that the provisions of § 215 are "incorporated in the bill . . . in practically the same form as they now appear in the act of May 22, 1918." H. R. Rep. No. 1365, 82d Cong., 2d Sess. 53. For that reason, the legislative history of the 1918 Act and the 1941 amendment, which I have set out at some detail, is doubly important in ascertaining the intent of the Congress as to the authority of the Secretary to deny passports under § 215 of the 1952 Act. Cf. *United States* v. *Plesha,* 352 U. S. 202, 205 (1957).

At the time of the 1952 Act, a national emergency proclaimed by President Truman on December 16, 1950, in

response to the Korean conflict, was—and still is today—in existence. Proc. No. 2914, 64 Stat. A454. In reliance on that, the President invoked the travel restrictions of § 215 on January 17, 1953. Proc. No. 3004, 67 Stat. C31. The proclamation by which this was done carefully pointed out that none of its provisions should be interpreted as revoking any regulation "heretofore issued relating to the departure of persons from, or their entry into, the United States." *Id.* Among the regulations theretofore issued were those now attacked relating to the issuance of passports to Communists, for they had been promulgated to be effective on August 28, 1952, shortly after passage of the 1952 Act. 17 Fed. Reg. 8013.

Congress, by virtue of § 215 of the 1952 Act, has approved whatever use of his discretion the Secretary had made prior to the June 1952 date of that legislation.[1] That conclusion necessarily follows from the fact that § 215 continued to make legal exit or entry turn on possession of a passport, without in any way limiting the discretionary passport power theretofore exercised by the Secretary. See *United States* v. *Allen-Bradley Co.,* 352 U. S. 306, 310–311 (1957); *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535, 544–545 (1954); *United States* v. *Cerecedo Hermanos y Compañia,* 209 U. S. 337, 339 (1908). But the Court then determines (1) that the Secretary's denial of passports in peacetime extended to only two categories of cases, those involving allegiance and those involving criminal activity, and (2) that the Secre-

---

[1] This is not seriously disputed by the majority. However, reference is made to a reluctance to interpret broadly the practice of the Secretary approved by Congress in the 1952 Act because the denial of passports on security grounds had not "jelled" at the time of the 1926 Act. But that overlooks (1) that it is congressional intent in the 1952 statute, not the 1926 statute, to which we look, and (2) that there is abundant evidence, set out in this opinion, of security denials before as well as after 1926.

tary's wartime exercise of his discretion, while admittedly more restrictive, has no relevance to the practice which Congress can be said to have approved in 1952. Since the present denials do not involve grounds either of allegiance or criminal activity, the Court concludes that they were beyond the pale of congressional authorization. Both of the propositions set out above are vital to the Court's final conclusion. Neither of them has any validity: the first is contrary to fact, and the second to common sense.

The peacetime practice of the State Department indisputably involved denial of passports for reasons of national security. The Report of the Commission on Government Security (1957), 470–473, summarizes the Department's policy on granting passports to Communists by excerpts from State Department documents. Shortly after the 1917 Russian Revolution, the Department "became aware of the scope and danger of the world-wide revolutionary movement and the attendant purpose to overthrow all existing governments, including our own." Thereafter "passports were refused to American Communists who desired to go abroad for indoctrination, instruction, etc. *This policy was continued until 1931* . . . ." (Emphasis added.) From 1931 "until World War II no persons were refused passports because they were Communists." After World War II, "[a]t first passports were refused," but upon reconsideration of the matter in 1948, "the decision was made that passports would be issued to Communists and supporters of communism who satisfied the Department that they did not intend, while abroad, to engage in the promotion of Communist activities." At the same time, however, it was decided that "passports should be refused to persons whose purpose in traveling abroad was believed to be to subvert the interest of the United States." Later in 1948 the policy was changed to give Communist journalists passports even though they were "actively

promoting the Communist cause." Nearly two years later, in September 1950, the latter leniency was reversed, after it was pointed out "that the Internal Security Act of 1950 clearly showed the desire of Congress that no Communists should be issued passports of this Government." [2] The matter was referred to the Department's Legal Adviser, "who agreed that it was the duty of the State Department to refuse passports to all Communists, including journalists."

Other evidence of peacetime denials for security reasons is more scattered, but nevertheless existent. Much of it centers around opposition to the Internal Security Act of 1950, for one of the stated aims of that legislation was denial of passports to Communists. The minority report of the Senate Committee on the Judiciary objected, "But this can be done under the existing discretionary powers of the Secretary of State . . . as evidenced by the recent denial or cancellation of a passport to Paul Robeson." S. Rep. No. 2369, Part 2, 81st Cong., 2d Sess. 10. President Truman, in vetoing that Act, stated: "It is claimed that this bill would deny passports to Communists. The fact is that the Government can and does deny passports to Communists under existing law." 96 Cong. Rec. 15631.[3]

In 1869 Attorney General Hoar advised the Secretary of State that good reason existed for the passport power being discretionary in nature, for it might sometimes be "most inexpedient for the public interests for this country to grant a passport to a citizen of the United States."

---

[2] For a comprehensive story of Communism in America indicating the necessity for passport control, see Hoover, Masters of Deceit (1958).

[3] To the same effect see the statement of Senator Kilgore during Senate debate on the Act, 96 Cong. Rec. 14538, and an amendment offered to the Act in both the House, 96 Cong. Rec. 13756, and Senate, 96 Cong. Rec. 14599.

23 Op. Atty. Gen. 509, 511. As an example he referred to the case of "an avowed anarchist," for if such person were to seek a passport, "the public interests might require that his application be denied." *Ibid.* See also, 13 Op. Atty. Gen. 89, 92.

Orders promulgated by the Passport Office periodically have required denial of passports to "political adventurers" and "revolutionary radicals," the latter phrase being defined to include "those who wish to go abroad to take part in the political or military affairs of foreign countries in ways which would be contrary to the policy or inimical to the welfare of the United States." See, shortly after the end of World War I, Passport Office Instructions of May 4, 1921; in 1937, Passport Office Instructions of July 30, 1937; in 1948, Foreign Service Regulations of July 9, 1948.

An even more serious error of the Court is its determination that the Secretary's wartime use of his discretion is wholly irrelevant in determining what discretionary practices were approved by Congress in enactment of § 215. In a wholly realistic sense there is no peace today, and there was no peace in 1952. At both times the state of national emergency declared by the President in 1950, wherein he stated that "world conquest by communist imperialism is the goal of the forces of aggression that have been loosed upon the world" and that "the increasing menace of the forces of communist aggression requires that the national defense of the United States be strengthened as speedily as possible," was in full effect. Proc. No. 2914, 64 Stat. A454. It is not a case, then, of judging what may be done in peace by what has been done in war. Professor Jaffe has aptly exposed the fallacy upon which the majority proceeds:

> "The criterion here is the defense of the country from external enemies. It is asserted that the precedents of 'war' have no relevance to 'peace.' But the

critical consideration is defense against an external enemy; and communication abroad between our citizens and the enemy cannot by its nature be controlled by the usual criminal process. The facts in a particular case as to the citizen's intention are inevitably speculative: all is to be done after the bird has flown. Now our Congress and the Administration have concluded that the Communist International is a foreign and domestic enemy. We deal with its domestic aspect by criminal process; we would seem justified in dealing with its external aspect by exit control. If an avowed Communist is going abroad, it may be assumed that he will take counsel there with his fellows, will arrange for the steady and dependable flow of cash and information, and do his bit to promote the purposes of the 'conspiracy.' " Jaffe, The Right to Travel: The Passport Problem, 35 Foreign Affairs 17, 26.

Were this a time of peace, there might very well be no problem for us to decide, since petitioners then would not need a passport to leave the country. The very structure of § 215 is such that either war or national emergency is prerequisite to imposition of its restrictions.

Indeed, rather than being irrelevant, the wartime practice may be the only relevant one, for the discretion with which we are concerned is a discretionary control over international travel. Yet only in times of war and national emergency has a passport been required to leave or enter this country, and hence only in such times has passport power necessarily meant power to control travel.[4]

---

[4] Peacetime exercise of the passport power may still be relevant from another point of view, namely, if other countries hinge entry on possession of a passport, the right of international travel of a United States citizen who cannot secure a passport will thereby be curtailed. For though he can get out of this country, he cannot get into another.

Finally, while distinguishing away the Secretary's passport denials in wartime, the majority makes no attempt to distinguish the Secretary's practice during periods when there has been no official state of war but when nevertheless a presidential proclamation of national emergency has been in effect, the very situation which has prevailed since the end of World War II. Throughout that time, as I have pointed out, the Secretary refused passports to those "whose purpose in traveling abroad was believed to be to subvert the interest of the United States." Report of the Commission on Government Security, *supra.* Numerous specific instances of passport denials on security grounds during the years 1947–1951 were reported in a February 1952 law review article, nearly half a year prior to passage of § 215. Note, Passport Refusals for Political Reasons, 61 Yale L. J. 171.

On this multiple basis, then, I am constrained to disagree with the majority as to the authority of the Secretary to deny petitioners' applications for passports. The majority's resolution of the authority question prevents it from reaching the constitutional issues raised by petitioners, relating to claimed unlawful delegation of legislative power, violation of free speech and association under the First Amendment, and violation of international travel under the Fifth Amendment. In view of that, it would be inappropriate for me, as a dissenter, to consider those questions at this time. Cf. *Peters* v. *Hobby,* 349 U. S. 331, 353–357 (1955). Accordingly, I would affirm on the issue of the Secretary's authority to require the affidavits involved in this case, without reaching any constitutional questions.