**UNITED STATES of America,**
**Plaintiff,**

v.

**Lee Levi LAUB, Phillip Abbott Luce,**
**Stefan Martinot and Anatol Schlos-**
**ser, Defendants.**

**No. 64–CR–137.**

United States District Court
E. D. New York.

April 15, 1966.

Probable Jurisdiction Noted
June 13, 1966.

See 86 S.Ct. 1891.

434

Joseph P. Hoey, U. S. Atty., Eastern Dist. of New York, for plaintiff; Vincent T. McCarthy, Chief Asst. U. S. Atty., William J. Hipkiss, Sp. Atty., Dept. of Justice, Washington, D. C., of counsel.

Rabinowitz & Boudin, New York City, for defendants Lee Levi Laub and Stefan Martinot; Leonard B. Boudin, New York City, of counsel.

Englander & Englander,. New York City, for defendant Anatol Schlosser; Isidore Englander, New York City, Joseph Forer, Washington, D. C., of counsel.

ZAVATT, Chief Judge.

This case relates to a trip to Cuba made by fifty-eight American citizens who departed from the United States in June 1963 via air transportation out of Idlewild International Airport (now known as Kennedy International Airport and hereinafter referred to as Kennedy Airport); entered Cuba, where they remained for approximately two months; returned therefrom to the United States, entering at Kennedy Airport on August 30, 1963.

The defendants were indicted, charged with having conspired among themselves and with Salvatore Cucchiari and Ellen Irene Shallit (named as co-conspirators but not as defendants) to induce, recruit and arrange for the group to depart from the United States for the Republic of Cuba "without bearing a valid passport for the Republic of Cuba," and to violate 8 U.S.C. § 1185(b) [1] and regulations issued thereunder. See notes 27, 28, 32, in-

1. "§ 1185. Travel control of citizens and aliens during war or national emergency—Restrictions and prohibitions on aliens

(a) When the United States is at war or during the existence of any national emergency proclaimed by the President, or, as to aliens, whenever there exists a state of war between or among two or more states, and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful—
* * * * *
(3) for any person knowingly to make any false statement in an application for permission to depart from or enter the United States with intent to induce or secure the granting of such permission either for himself or for another;
* * * * *

Citizens
(b) After such proclamation as is provided for in subsection (a) of this section has been made and published and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful. for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport.

Penalties
(c) Any person who shall willfully violate any of the provisions of this section, or of any order or proclamation of the President promulgated, or of any permit, rule, or regulation issued thereunder, shall, upon conviction, be fined not more than $5,000, or, if a natural person, imprisoned for not more than five years, or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall be punished by like fine or imprisonment, or both; and any vehicle, vessel, or air-

fra. The indictment also charges the defendants Laub, Luce and Martinot with having departed from the United States for the Republic of Cuba and with having entered the United States "without bearing a valid passport." [2] For the reasons hereinafter stated, the court is compelled to find the defendants Laub, Martinot and Schlosser not guilty on the counts of the indictment in and by which they are charged, i. e., Counts One, Three and Five as to the defendant Laub; Counts One, Two and Seven as to the defendant Martinot; Count One as to the defendant Schlosser. The indictment is still pending as to the defendant Luce. See note 2, supra.

The evidence on the trial suggests that, had the matter been so presented, a grand jury might well have indicted some or all of the four defendants for (1) having knowingly made false statements in their applications for permission to depart from the United States, in violation of 8 U.S.C. § 1185(a) (3); [3] (2) for having made false statements in their applications for passports, in violation of 18 U.S.C. § 1542; (3) for having used their passports, the issue of which was secured by reason of false statements, in violation of 18 U.S.C. § 1542; [4] "(4) for having conspired to induce others to make false statements in their applications for passports, in violation of 18 U.S.C. § 1542." The evidence suggests, further, that a grand jury might well have indicted at least the defendant Laub, charging him with having acted as the agent of a foreign principal without having filed a registration statement with the Attorney General, in violation of Subchapter II of Chapter 11 of Title 22, United States Code.[5] Nevertheless, an indictment was sought and obtained charging the defendants only with alleged violations of 8 U.S.C. § 1185(b) and "the regulations is-

---

craft together with its appurtenances, equipment, tackle, apparel, and furniture, concerned in any such violation, shall be forfeited to the United States."

**2.** The defendant Schlosser was not charged with departure and entry because, despite his participation in the alleged conspiracy, he decided in late May or early June 1963 that discretion was the better part of valor and, in the language of the defendant Luce, "chickened-out." He had spoken to many lawyers and had become befuddled as to the possible legal consequences of the trip. He feared that it would result in arrest and expressed the opinion that the issue that would be raised by the trip to Cuba was not revolutionary enough to be arrested for.

A severance of the defendant Luce was granted, Fed.R.Crim.P. 14, and the trial proceeded to the court without a jury as to the defendants Laub, Martinot and Schlosser.

**3.** See note 1, supra.

**4.** "§ 1542. False statement in application and use of passport

Whoever willfully and knowingly makes any false statement in an application for passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another, contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws; or

Whoever willfully and knowingly uses or attempts to use, or furnishes to another for use any passport the issue of which was secured in any way by reason of any false statement—

Shall be fined not more than $2,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 771."

See Browder v. United States, 312 U.S. 335, 61 S.Ct. 599, 85 L.Ed. 862 (1941); Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941).

**5.** "SUBCHAPTER II.—REGISTRATION OF FOREIGN PROPAGANDISTS

\* \* \* \* \*

§ 612. Registration statement; filing, contents

(a) No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by this section and subsection (b) of this section or unless he is exempt from registration. \* \* \*

\* \* \* \* \*

§ 618. Enforcement and penalties

(a) Any person who—

(1) willfully violates any provision of this subchapter or any regulation thereunder, \* \* \*

shall, upon conviction thereof be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both."

sued thereunder" and with a conspiracy to violate the same.

## THE FACTS

The United States severed diplomatic relations with Castro's Communist Cuba on January 3, 1961. We became aware of Cuba-Russia missile activities in Cuba in October 1962. Pres.Procl. 3504, October 23, 1962, 3 CFR 232 (1959–1963 Comp.). It may or may not be a mere coincidence that the defendants Laub and Martinot organized the so-called "Ad Hoc Student Committee for Travel to Cuba" at a meeting held in an unspecified place in New York City on October 14, 1962; that the defendant Schlosser became identified with this movement shortly thereafter; that, during the missile crisis and in December 1962, the name of the Committee was changed to "Permanent Student Committee for Travel to Cuba"; that the Committee attempted to recruit and organize a group of United States citizens to depart for Cuba in December 1962. This plan aborted when Canada refused them permission to depart therefrom by plane for Cuba. By coincidence the trial of the defendants Laub, Martinot and Schlosser occurred during the mass exodus from Cuba of native citizens who abandoned all of their worldly possessions, separated from close relatives and lifelong friends and risked the perils of the sea in small boats in order to escape from the "blessings" of Castro's Communist Cuba for a new birth of freedom in the United States of America. The mass exodus still continues as this opinion is being written.

The intention of the defendants Laub, Martinot and Schlosser to depart from the United States for the purpose of entering Cuba and to induce others to do likewise was open, notorious, with an awareness of 8 U.S.C. § 1185(b), the regulations of the Secretary of State (hereinafter the Secretary), his regulations, his policy declaration of January 16, 1961, infra, and the interpretation of § 1185, said regulations and said declaration by the Department of State (hereinafter the Department).

At the meeting of October 14, 1962, those present claimed that there were contradictions in "certain press reports * * * about Cuba"; they expressed their determination to make a trip to Cuba for the alleged purpose of seeing and evaluating the situation and "to attempt to form as objective and as complete an opinion * * * of the Cuban situation" as they could. Five days later, on October 19, 1962, the defendant Schlosser applied in writing to the Department for validation of his passport [6] "for travel to Cuba during the forthcoming Christmas vacation." Having received no reply, he wrote to the Department on November 16, 1962, stating: "I have received and accepted an invitation from the Cuban Federation of University Students to spend my Christmas holidays in Cuba." His request was denied by letter dated November 16, 1962:

> "Exceptions to the general policy of limiting travel by United States citizens to Cuba are made only in cases of extreme emergency requiring the immediate presence of the applicant in Cuba. It is not considered that your request comes within the criteria."

Undaunted, Schlosser advised the Department, by letter dated December 5, 1962:

> "Nevertheless, I have accepted an invitation issued by the Cuban Federation of University Students, and I intend to make the trip as originally planned. Therefore, please clarify what is meant by 'general policy.' On what legal grounds is this policy based? what [sic] will be the legal ramifications of my actually making the trip without United States passport validation?"

Whereupon, the Department advised him that its policy with reference to travel to Cuba had been announced on January 16, 1961; that it was "in conformity with the Department's normal practice of limiting travel to those countries with which

---

6. No. C 44149, issued by the Department on June 11, 1962. Its terms will be considered later in this opinion.

the United States does not maintain diplomatic relations"; that "Travel to Cuba by United States citizens without a passport specifically validated by the Department of State, for that purpose, constitutes a violation of the Travel Control Law and Regulations (Title 8 US Code Sec. 1185, Title 22 Code of Federal Regulations Sec. 53.3)" and called his attention to the maximum penalties for "a wilfull violation of the law."

On November 2, 1962 (three weeks after the meeting of October 14, 1962), the defendant Martinot applied for validation of his passport[7] "for a trip to Cuba over the forthcoming Christmas vacation." "I am fully cognizant of the present state of relations between the United States and Cuba, but trust that my [sic] the end of December the tension may have subsided sufficiently to permit a more objective view of the situation." This request was denied by a Department letter similar to and bearing the same date as that to Schlosser.

Nevertheless, the plan to make a trip to Cuba in December 1962 was not yet abandoned. Pursuant to an announcement published in the National Guardian, a meeting of the Committee (still known as the "Ad Hoc Committee for Travel to Cuba"), attended by approximately one hundred persons, was held in an apartment at 885 Riverside Drive, New York, N.Y.,[8] on December 15, 1962. There Schlosser read his correspondence with the Department; Laub asserted that, notwithstanding, the December trip would be taken at a cost of only $25 per head (to cover the bus trip from New York City to Canada) and that "the rest of the cost was to be picked up by the Cuban Government." At a press conference held at the Marteen Hotel in Buffalo, N.Y., on December 23rd, however, Schlosser, speaking for the Ad Hoc Committee, announced that the plans for a trip to Cuba were cancelled temporarily but that the Committee would continue in its efforts to visit Cuba.

Soon thereafter steps were taken to recruit applicants and make arrangements for the trip that eventuated in June 1963 and is the subject matter of this case. A passport issued to Laub on May 24, 1960, had not yet expired.[9] Nevertheless, he applied to the New York Passport Agency of the Department on January 29, 1963, for a new passport, stating that he intended to depart for Mexico on February 1, 1963, and to remain there for a period of two to three weeks for "vacation and visit." [10] Passport No. D014611 was issued to him the same day. Unlike the passports issued to Martinot and Schlosser, it did not provide that it was not valid for travel to Cuba.[11]

In either February or March 1963, Laub departed the United States, via Mexico, for Cuba where he remained for approximately three weeks and returned to the United States via Prague, Czechoslovakia. The purpose of his trip was to make arrangements for a group visit of United States citizens to Cuba during the summer of 1963, under the aegis of the Permanent Student Committee for Travel to Cuba. While in Cuba Laub obtained an agreement on the part of Cuban officials (1) that the passports of the members of the visiting group would not be stamped upon their entry into and departure from Cuba and (2) that the Cuban government would pay all costs of transportation of the group from New York to Cuba and return as well as the costs of their food, lodging and travel while in Cuba.

---

7. No. C 719424, issued October 23, 1962. Its terms will be considered later in this opinion.

8. The record is silent as to the owner or tenant of this apartment.

9. The period of passport validity is three years from its date. It may be renewed for a further period of two years. 22 U.S.C. § 217a.

10. No passport was required for such a visit. See note 28, infra.

11. Laub, Martinot and Schlosser declined to produce their passports at the trial. No copies thereof were produced by the Government. Findings as to passport numbers, dates of issue and terms and conditions thereof are based upon stipulations of fact made in open court on the record.

An active program to recruit persons for and to organize the June trip got under way. Laub, Martinot, Luce and Schlosser, as well as the alleged co-conspirators, Cucchiari and Shallit participated. Meetings, attended by two or more of the defendants were held. Meetings, attended by one or more of the defendants, and by prospective recruits, were held. At a meeting held at the Palonia Club, 201 Second Avenue, New York, N. Y., on April 20, 1963, attended by Laub, Martinot and approximately ten to fifteen other persons, Laub invited those present to make the trip and distributed application forms which included the telephone number of Schlosser, where a representative of the Permanent Committee could be reached. Laub held out the prospect of a trip to Cuba, most of the expenses of which would be paid by a group of Cuban students; assured them that their passports would not be stamped in Cuba; referred to a memorandum of law prepared by the American Civil Liberties Union supporting his opinion that a State Department passport validation was not required for the trip; stated that, if those who made the trip were arrested, the American Civil Liberties Union might defend them; outlined the procedure to be followed by those who desired to make the trip.

On a Saturday during the second week of May, Luce visited Schlosser's home at 42 St. Marks Place, New York, N. Y. (having previously received an application blank from Laub), where he discussed his application with Schlosser and Martinot.[12]

While the other defendants occupied themselves with the project in New York, Laub travelled to San Francisco, California, to induce people to join the group. On May 2, 1963, he addressed from fifty to sixty students at the Education Building of San Francisco State College, at a meeting sponsored by the "San Francisco State College Student Peace Union" and the "Fair Play to Cuba Committee." He explained the project of the Permanent Student Committee; stated that he was travelling around the country [13] to advise students of the planned trip and that, in his opinion, the trip was lawful. He distributed application forms; advised those interested to apply for passports and list a European country as the place to be visited; stated that most of the expenses would be paid by the Cuban Federation of University Students and announced a meeting to be held on May 4, 1963, in San Francisco at the apartment of one Robert Kaffke, where completed applications would be received and questions about the trip answered. From twenty-five to thirty-five persons attended this meeting. Laub collected applications and $10 application fees. One such, a check to the order of the Permanent Student Committee, was subsequently endorsed for the Committee by Schlosser.

Laub was back in New York City during the latter part of May and proceeded

12. On May 20, 1963, Luce applied for a passport. He stated that "Education" was the purpose of his trip; that "France, England and Other Countries" were to be visited; that June 20, 1963 was the approximate date of his departure; that he was "Undecided" as to the proposed length of his stay abroad and as to whether he would travel in an organized tour. The Department issued passport number D 396677, dated May 23, 1963.

13. Testifying before the House Committee on Un-American Activities in September 1963, Laub admitted to having visited the following colleges and universities in organizing and recruiting students for the June 1963 trip:

University of California, Berkeley, California.
San Francisco State College, San Francisco, California.
Stanford University, Palo Alto, California.
University of Chicago
University of Wisconsin
University of Michigan
Brooklyn College
City College
Columbia College
Hearings Before the Committee on Un-American Activities, House of Representatives, 88th Cong., 1st Sess., pt. 3, at 718 (1963).

to reserve air transportation for the group. He was at the Fifth Avenue, New York, office of British Overseas Airways Corporation (hereinafter BOAC) on May 28th and 31st, seeking reservations for a group departure on any available date between June 25th and 29th. On May 31st he also visited the New York office of Royal Dutch Airlines (hereinafter KLM) to arrange for round trip flights to Paris, via Amsterdam, for other members of the group, the date of departure from Kennedy Airport to be some time between June 25th and July 1st. Those who were to take the trip, he said, were friends who, as children, had pledged to meet some day at the Eiffel Tower in Paris. On June 10th he was at the Ottawa, Canada, office of BOAC, where he paid a $5,000 deposit in United States currency for New York to Paris round trip reservations. The following day he returned to that office and paid the balance of $17,739.20 in United States currency. That day he also visited the Ottawa office of KLM where he paid $13,436.80 in United States currency. A few days later, Laub was back in New York City; visited the KLM office, where he made changes in the number of reservations and received either twenty-two or twenty-three tickets for the group which was to depart from Kennedy Airport on June 25th aboard KLM flight number 606 for Paris via Amsterdam. He was back at the New York City office of BOAC on June 22nd, where he received tickets for a group flight on BOAC flight number 552 departing for London on June 25, 1963, and further transportation of the group to Paris on British European Airways flight number 344. He also picked up a ticket for Martinot on BOAC flight number 558 departing Kennedy Airport for Paris on June 23, 1963. On June 24, 1963, Laub ordered and received his ticket for a Trans-Canada Air Lines flight to Montreal, Canada, departing June 25, 1963. He already had his ticket for a connecting flight on Air France departing the same day from Montreal for Paris.

The alleged co-conspirator, Salvatore Cucchiari, was in the West Coast area to inform selected participants as to how they were to proceed to New York and what they should do upon arrival there. He arranged for free transportation of two of the travellers by automobile from San Francisco to Philadelphia and instructed them to call a specified telephone number upon their arrival in New York City. These two members of the group later learned that they were calling the apartment of the alleged co-conspirator Ellen Shallit. Upon arrival at her apartment on June 23rd, Shallit requested of each of them the $100 fee which Laub had explained at the May 2nd and 4th meetings in San Francisco. Cucchiari turned up at the Shallit apartment that day.

On the following day, Laub telephoned a prospect in Boston to advise that, if he were still interested in making the trip, he should come to New York City that afternoon and telephone Shallit upon arrival. He did so and, pursuant to Shallit's instructions, went to her apartment. Cucchiari, Shallit and others who were to make the trip were present at the Shallit apartment. Cucchiari gave instructions as to their conduct and movements until departure time the following day. (By this time the activities of the defendants and their "co-conspirators" were no longer open and notorious). In order to avoid any leak of the actual flight arrangements, Cucchiari told those present that they would be travelling to Cuba via Canada.

On June 23rd Laub had met with and instructed those who were to be group leaders. Those who were making the trip were to be separated into small groups, each under the supervision of a leader. Each leader was to keep his group confined to an apartment until their departure for the air terminal. Leaders were not to divulge the actual flight route. Rather, they were to inform their groups that they would travel to Cuba via Canada. No members of the group were to speak to any government official who might approach them. Only group leaders would act as spokesmen. No one

was to turn over his passport to any government official under any circumstance.

The morning of June 25th had the aspects of a cloak and dagger operation. Small groups met in various apartments, including those of Martinot, Luce and Shallit. In Martinot's apartment, Laub gave final instructions to one group. In Shallit's apartment, final instructions were given to another group by Cucchiari and Shallit. Copies of a press release, prepared in part by Luce and postdated June 26, 1963, were distributed, which restated the alleged objectives of the Permanent Committee and named Laub, Luce, Shallit and Cucchiari as "group representatives." Cucchiari distributed airline tickets to the members of this group. Luce, as leader of a group gathered in his apartment, gave final instructions and collected $300. Laub appeared at Luce's apartment that afternoon accompanied by one Fred Jerome, a leader of the Progressive Labor Party, which Luce described as "a Marxist-Leninist self-avowed Communist Party." Luce delivered the $300 to Laub who left with Jerome.

At about noon of June 25th, the several groups of fellow travellers left the respective apartments for the East Side Airlines Terminal. At the Terminal Laub distributed the airplane tickets to those who had been held incommunicado in Martinot's apartment; Fred Jerome delivered to Luce the airline tickets for his group; Cucchiari distributed the airline tickets to those who had been held incommunicado in Shallit's apartment. Martinot had departed from Kennedy Airport for Paris two days previously aboard BOAC flight number 558. Laub departed from Kennedy Airport June 25th for Canada (via Trans-Canada Air Lines) and, on the same day, from Canada for Paris (via Air France). The balance of the group (including Cucchiari, Shallit, Kaffke, Luce and his wife) departed the United States from Kennedy Airport via KLM and BOAC, on June 25, 1963.

The exact date of Martinot's arrival in Paris is not revealed. But he was in Paris before the group arrived. Laub and the rest of the group arrived at Orly Airport, Paris, on June 26, 1963. After checking in at one or more hotels for an overnight stop in Paris, the entire group met in a private room in a restaurant. There, in the presence of Martinot, Laub announced that the group would proceed to Prague the next morning via Czechoslovakia National Airlines; that each was free to spend the evening as he chose; that no one should do anything provocative, such as excessive drinking, which might entail difficulties with the police; that the group was in no position to appeal to the American Embassy "to bail us out."

On the morning of June 27, 1963, the entire group checked in at the Czechoslovakia National Airlines counter at Orly. They boarded a specially chartered plane of that airline and arrived at Prague, Czechoslovakia, later that day. Their passports were not stamped upon arrival at or subsequent departure from Czechoslovakia, pursuant to arrangements previously made with Czechoslovakian authorities in Prague by a representative of Cuba. In a waiting room at Prague Airport, a Vice Consul of the United States read to them a prepared statement advising them that "travel to Cuba by a U. S. citizen without a passport specifically validated by the Department of State for that purpose constitutes a violation of U. S. travel control law and regulations. (Title 8 U.S.Code Sec. 1185; Title 22 Code of Federal Regulations, Sec. 53.3)" and that a wilful violation of the law is punishable by fine and/or imprisonment. The group spent two days at a hotel in Carlsbad. They were addressed by two representatives of the Cuban government, one of whom expressed the pleasure of his government over the fact that young Americans had decided to break the travel ban by going to Cuba.

On the morning of June 29, 1963, the group departed from Prague Airport aboard a Cubana Airlines plane which proceeded to Havana, Cuba (via Shannon, Ireland, and Gander, Newfoundland), landing there on June 30, 1963. None of

the group displayed his United States passport upon arrival, or upon his subsequent departure from Cuba.

The indictment does not cover the period during which the group was in Cuba. Hence, the activities of the defendants Laub and Martinot and other members of the group were not revealed at the trial. It was stipulated on the record at the trial, however, that the defendants Laub and Martinot departed Cuba August 25, 1963, via Iberian Airlines for Madrid, Spain, with stopovers at Bermuda and the Azores; that they arrived at Madrid on August 26, 1963; that they departed Madrid August 29, 1963, aboard a plane of Iberian Airlines and entered the United States at Kennedy Airport on August 30, 1963.

The committee titles adopted by the defendants who originated the plan to visit Cuba—"Ad Hoc Student Committee" and "Permanent Student Committee"—would suggest as referents a group of curious, inquisitive, open-minded college youth eager to make an objective, on the spot study of conditions in Cuba. The fact is, however, that the defendants Laub, Martinot and Schlosser (as well as Luce) embarked upon this project with a preconceived conviction that the American press was not giving Cuba a "fair shake," with all that that implies. There was an absence of the yearning to learn by travel "whether or not this blessed spot is blest in every way." [14]

Luce was not a student at any school or college. He had received a B.A. degree in 1958 at Mississippi State University and an M.A. degree at Ohio State University in 1960. In 1961 he abandoned his pursuit of a Ph.D. degree at Ohio State University and came to New York City where he wrote, as he testified, "for a variety of left-wing publications" for a short time. From the fall of 1961 to September of 1964, he was in the employ of the Emergency Civil Liberties Committee as associate editor of its publication, "Rights." Laub had been a student at Columbia College in New York City where he was in his senior year in October 1962. It would appear that he abandoned or at least neglected his college career, became an organizer of the Progressive Labor Movement [15] and devoted a considerable period of his time to the organization of a program to defy the State Department's regulations purporting to restrict travel of United States citizens to Cuba. Robert Kaffke, one who made the trip, was thirty-eight years of age in 1963, hardly in the "student" class. Martinot had been a graduate mathematics student at Columbia University. He and Laub were the organizers of the "Columbia Progressive Labor Student Club." He testified to that effect and admitted to being a Marxist-Leninist before the House Committee on

14. "How shall I know, unless I go
To Cairo and Cathay,
Whether or not this blessed spot
Is blest in every way?
Now it may be, the flower for me
Is this beneath my nose
How shall I tell, unless I smell
The Carthaginian rose?"
Millay, A Few Figs From Thistles 13 (1st ed. 1922).

15. "Spark—Western Voice For Revolution," issue of June 1965, Vol. 1, No. 4, at page 2, describes itself as the "Western newspaper of the Progressive Labor Party" and among its "dedicated tasks" states:
"Above all, fight for a new way of life in which the working people will own and control all factories, banks, mines, ships, railroads, land and other productive property; a new way of life in which working people will run the police, courts and all other divisions of government."
In that issue, at page 2, it reports the founding of "a new communist party—the Progressive Labor Party" and quotes from the key-note speech of its President: "Altering capitalism to suit the needs of the people has not, does not and cannot work."
It includes, at page 6, what purports to be the full text of a speech made by "Levi Laub, National Student Coordinator of the Progressive Labor Party."

Un-American Activities in May of 1963, prior to his departure for Cuba.[16]

Of the fifty-eight "students" who made the trip, twenty-five to thirty stood up in Havana, Cuba, when Laub asked all members of the Progressive Labor Group to rise. It would appear that the majority of those who made the trip were committed in advance to the views and objectives of the left-wing Progressive Labor Party. Considering the intensive campaign waged by the defendants, and particularly Laub; Laub's big-sell at so many of our college and university campuses; the tempting lure of an all-expense trip to and vacation in Cuba—considering all of this, it is significant that the defendants were able to corral such a small group. From the known composition of a majority of the group, it would appear that few, if any, in the group were typical American students; that the vast majority of the students solicited by the defendants displayed greater resistance to temptation than Adam and Dr. Faustus.

This court does not equate dissent with disloyalty. Nor does it equate loyalty with dissent. It has no doubt that the objective of the defendants was not a genuine search for the truth in Cuba. Nevertheless, the issues in this case are not to be determined on the basis of the political views of the defendants or their sincerity or lack thereof. Their actions may excite popular prejudice and many American citizens may feel that the defendants come within the class which President Lincoln described as those who "stand on the Constitution, whilst they [would] stab it in another place." [17] "[B]ut if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." Dissent of Mr. Justice Holmes in United States v. Schwimmer, 279 U.S. 644, 654–655, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929).

## THE LAW

The court finds beyond a reasonable doubt that the defendants Laub, Martinot and Schlosser wilfully and knowingly agreed among themselves and with Salvatore Cucchiari and Ellen Irene Shallit to induce, recruit and arrange for a group of American citizens, including the defendants Laub and Martinot, to depart from the United States for the Republic of Cuba; that the defendants Laub, Martinot and Schlosser performed the acts in furtherance thereof hereinabove recited; that the defendants Laub and Martinot wilfully and knowingly departed from the United States for the Republic of Cuba on June 23 and June 25, 1963, respectively; that the defendants Laub and Martinot wilfully and knowingly entered the United States on August 30, 1963, arriving from the Republic of Cuba via Bermuda and Spain.

The questions are whether the said agreement constituted a conspiracy; whether the acts they performed, hereinabove recited, were performed in furtherance of a criminal conspiracy; whether the defendants Laub and Martinot committed substantive crimes when they departed from and entered the United States.

### A Case of First Impression

It has already been noted that the defendant Schlosser bore a passport, issued by the Department on June 11, 1962 (see note 6, supra); that the defendant Martinot bore such a passport, dated October 23, 1962 (see note 7, supra); that the defendant Laub was the bearer of such a passport dated January 29, 1963 (supra page 437). The period of the validity of each of these passports being three

16. Hearings Before the Committee on Un-American Activities, House of Representatives, 88th Cong., 1st Sess., pt. 1, at 384 (1963).

17. Letter to John W. Crisfield, June 26, 1862, Francis D. Tandy Co., Lincoln's Complete Works, Vol. VII, 237 (1905); Shaw, The Lincoln Encyclopedia 63 (1950).

years,[18] they had not expired when the defendants departed from and returned to the United States. The passports of the defendants Marinot and Schlosser provided in print:

"This Passport Is Not Valid For Travel To Or In Communist Controlled Portions Of China, Korea, Viet-Nam, Or To Or In Albania."

In addition, the word "Cuba" was stamped beneath the names of the proscribed countries included in print. Beneath the names of all of these countries, including "Cuba," the passports of Martinot and Schlosser bore the following stamp:

"A Person Who Travels To Or In The Listed Countries Or Areas May Be Liable For Prosecution Under Section 1185, Title 8, U. S. Code, And Section 1544, Title 18, U. S. Code."

The passport issued to the defendant Laub, on the other hand, contained no reference to Cuba. Why "Cuba" was not listed on his passport as one of the proscribed areas and the significance, if any, of that omission were not explained or commented upon during the trial or in any trial memoranda. Nevertheless, Laub was aware of the regulations and policy of the Secretary when he applied for his passport and when he departed from and returned to the United States.

The substance of section 1185 first appeared in the Act of May 22, 1918, ch. 81, 40 Stat. 559. It was in effect until 1921 when its provisions relating to citizens of the United States were terminated. Act of March 3, 1921, ch. 136, 41 Stat. 1359. In 1941, the Act of May 22, 1918 was revived by an amendment thereto. Act of June 21, 1941, ch. 210, 55 Stat. 252. The 1918 Act applied only while the United States was at war. The 1941 amendment applied not only while the United States was at war but also during the existence of the national emergency declared by the President on May 27, 1941. Proclamation No. 2487, 3 CFR 234 (1943 Cum. Supp.). These acts prohibited the departure from and entry into the United States by a citizen "unless he bears a valid passport." This prohibition remained in effect until it was supplanted in 1952 by 8 U.S.C. § 1185. During these periods (1918 to 1921 and 1941 to 1952) the departure and entry provisions were in effect by virtue of requisite proclamations and executive orders of the President. Proclamation No. 1473, August 8, 1918, Laws Applicable to Immigration and Nationality 1046 (1953 ed.); Executive Order No. 2932, August 8, 1918, id. at 1050; Proclamation No. 2523, November 14, 1941, 6 Fed.Reg. 5821. The regulations to implement Executive Order No. 2932 were contained in that order. Those to implement Proclamation No. 2523 were issued by the Secretary. 22 CFR Part 58 (1941 Supp.). These regulations of the Secretary, as modified and renumbered, were incorporated by reference into President Truman's Proclamation No. 3004, January 17, 1953, infra.

An attorney adviser with the Department who is "Chief of the Security Branch of the Legal Division" testified that he had not, in the course of his duties, read of any case which was prosecuted under the Act of May 22, 1918, supra, or the Act of June 21, 1941, supra, between 1918–1921 and 1941–1952, involving one who departed the United States with an unexpired passport issued by the Department and visited a proscribed area, despite the fact that his passport either was not validated for travel to such an area or recited that it was not valid for such travel. On the trial of this action, the Government conceded that, from 1952 (when section 1185 was enacted) to 1965, approximately 600 American citizens violated the Secretary's regulations and the restrictions contained in their unexpired passports by travelling to areas proscribed by the Secretary with passports not validated for such travel. Nevertheless, it is conceded that none of those citizens were prosecuted and that this is the first case in which the Government is prosecuting citizens of the United States crim-

---

18. See note 9, supra.

inally for a violation of 8 U.S.C. § 1185(b) for having departed the United States with an unexpired passport issued by the Secretary, thereafter entering an area so proscribed and thereafter entering the United States.

There are two reported cases in which citizens, bearing no unexpired passports, have been so prosecuted. In Worthy v. United States, 328 F.2d 386 (5th Cir. 1964), the defendant departed from the United States, entered Cuba and returned therefrom. He was prosecuted under 8 U.S.C. § 1185(b) for entering the United States "without bearing a valid passport"; found guilty and sentenced. Since he did not bear a nonexpired passport issued to him by the Department, the question as to what constitutes a "valid passport" was not presented. On appeal, the court held § 1185 unconstitutional insofar as it subjects to a criminal penalty a citizen who "does not have a passport" and returns to the United States: "[I]t is our conclusion that the Government cannot say to its citizen, standing beyond its border, that his re-entry into the land of his allegiance is a criminal offense; and this we conclude is a sound principle whether or not the citizen has a passport, and however wrongful may have been his conduct in effecting his departure." 328 F.2d at 394.[19] In United States v. Travis, 241 F.Supp. 472 (S.D.Cal.1964), aff'd 353 F.2d 506 (9th Cir., Nov. 19, 1965), petition for cert. filed (Jan. 28, 1966) (No. 963), 86 S.Ct., 1339, 16 L.Ed.2d 357 the defendant departed from the United States on two occasions with the intention of entering Cuba and did so via Mexico. For these two departures she was prosecuted under 8 U.S.C. § 1185(b) and the regulations thereunder, 22 CFR 53.1 through 53.9. It is not clear from a reading of the trial judge's opinion denying defendant's motion to dismiss the indictment, 241 F.Supp. 468 (S.D. Cal.1963), from his opinion finding the defendant guilty, 241 F.Supp. 472 (S.D. Cal.1964) or from the opinion of affirmance, supra, whether the defendant had no unexpired passport or had an unexpired passport not validated for travel to Cuba, i. e., a passport similar to that issued by the Department to the defendants Martinot and Schlosser. The trial judge has advised the court, however, that Helen Travis did not have any unexpired passport when she made the two departures for Cuba.[20]

Unlike Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the question for decision in the instant case is not whether the Secretary had the authority to refuse to validate the passports of the defendants Martinot and Schlosser for travel to Cuba. In Zemel the Supreme Court held that the Secretary had authority to refuse to "validate appellant's passport for travel to Cuba * * * by the authority granted by Congress in the Passport Act of 1926," [21] 381 U.S. at 13, 85 S.Ct. at 1279. The Court did not reach the question presented in the instant case, i. e., whether the enactment of 8 U.S.C. § 1185 in 1952 attaches criminal penalties to travel to an area for which one's passport is not validated. 381 U.S. at 13, 29, 85 S.Ct. at 1279, 1287, n. 4.

*The statute and "the regulations thereunder"*

8 U.S.C. § 1185(a) (see note 1, supra) is effective

"When the United States is at war or during the existence of any national

19. The Government did not appeal from the remand to the District Court for the discharge of the appellant.

20. Judge Crary's letter to me dated January 4, 1966 [1965]:
"The passport she had three years prior to the dates in question had expired and was therefore invalid as of the pertinent dates. So far as the record shows, she had an expired United States passport when she went to Mexico and from there to Cuba."

21. "§ 211a. Authority to grant, issue and verify passports
The Secretary of State may grant and issue passports * * * under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

emergency proclaimed by the President * * * *and* the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the *departure of persons from and their entry into* the United States, *and* shall make public proclamation thereof * * *." (Emphasis added.)

■ The latest presidential proclamation of a national emergency is that by President Truman on December 16, 1950, Proclamation No. 2914, 64 Stat. A454, 3 CFR 99 (1949–1953 Comp.).[22] The continuance of the national emergency, so proclaimed, was recognized by President Eisenhower in 1960 and in 1961 [23] and by President Kennedy in 1962.[24] There has been no presidential proclamation terminating the national emergency so declared. The defendants contend that the 1950 Presidential Proclamation related only to the emergency created by the Korean conflict and that the duration of the emergency so proclaimed must be limited to the duration of that conflict; that "[t]his court is not bound by a decade-old declaration of a national emergency which is inappli-

cable to the present situation and no longer exists." The parties to the instant case offered no evidence as to whether the national emergency so proclaimed still exists. The defendants tried this case on the fundamental proposition that, even if a national emergency still existed during the times stated in the indictment, section 1185(b) does not apply to the facts in this case. The court does have a right to consider whether the national emergency has expired by lapse of time. Chastelton Corp. v. Sinclair, 264 U.S. 543, 547, 44 S.Ct. 405, 406, 68 L.Ed. 841 (1924); contra, United States v. Travis, 241 F.Supp. 468, 471 (S.D.Cal.1963). For the reasons stated in MacEwan v. Rusk, 228 F.Supp. 306, 312–313 (E.D.Pa.1964), aff'd, 344 F.2d 963 (3d Cir. 1965), the court finds that the national emergency so proclaimed has not expired.[25] This contention of the defendants merits no extended treatment, since the court finds that the acts of the defendants do not constitute a crime under § 1185(b), even during the continuance of a national emergency proclaimed by the President pursuant thereto.

President Truman did not make the finding and the public proclamation thereof required by section 1185(a) or

22. Proclamation 2914
Proclaiming the Existence of a National Emergency
WHEREAS recent events in Korea and elsewhere constitute a grave threat to the peace of the world and imperil the efforts of this country and those of the United Nations to prevent aggression and armed conflict; and
WHEREAS world conquest by communist imperialism is the goal of the forces of aggression that have been loosed upon the world; and * * *
WHEREAS the increasing menace of the forces of communist aggression requires that the national defense of the United States be strengthened as speedily as possible:
NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, do proclaim the existence of a national emergency, which requires that the military, naval, air, and civilian defenses of this country be strengthened as speedily as possible to the end that we may be able to repel any and all threats

against our national security and to fulfill our responsibilities in the efforts being made through the United Nations and otherwise to bring about lasting peace."
President Truman later proclaimed that this national emergency still existed on January 17, 1953, in his Proclamation 3004 of that date. 67 Stat. C31, 3 CFR 180 (1949–1953 Comp.).

23. Executive Order No. 10861, February 11, 1960, 3 CFR 396 (1959–1963 Comp.) and Executive Order No. 10905, January 14, 1961, 3 CFR 436 (1959–1963 Comp.).

24. Executive Order No. 11037, July 20, 1962, 3 CFR 621 (1959–1963 Comp.).

25. In Zemel v. Rusk, 228 F.Supp. 65, 72 (D.Conn.1964), the court said that the national emergency proclaimed by President Truman in 1950 still continued. The Supreme Court did not question the existence of the national emergency so proclaimed, when it heard and decided *Zemel.*

**446**

impose additional restrictions, pursuant to section 1185(b), upon the departure of citizens of the United States from and their entry into the United States until his Proclamation No. 3004 of January 17, 1953, 67 Stat. C31, 3 CFR 180 (1949–1953 Comp.).[26]

The regulations of the Secretary, incorporated into this presidential procla-

**26.** After citing section 215 of the Immigration and Nationality Act as his authority to impose restrictions, his 1950 proclamation of a national emergency and the need of additional restrictions "upon the departure of persons from, and their entry into, the United States" and that "the interests of the United States" require additional restrictions, the President prescribed rules, regulations and orders with respect thereto:

"I hereby prescribe and make the following rules, regulations, and orders with respect thereto:

1. The departure and entry of citizens and nationals of the United States from and into the United States, including the Canal Zone, and all territory and waters, continental or insular, subject to the jurisdiction of the United States, shall be subject to the regulations prescribed by the Secretary of State and published as sections 53.1 to 53.9, inclusive, of title 22 of the Code of Federal Regulations. Such regulations are hereby incorporated into and made a part of this proclamation; and the Secretary of State is hereby authorized to revoke, modify, or amend such regulations as he may find the interests of the United States to require.

\* \* \* \* \*

[A]nd the provisions of this proclamation, including the regulations of the Secretary of State incorporated herein and made a part hereof, shall be in addition to, and shall not be held to revoke, supersede, modify, amend, or suspend, any other proclamation, rule, regulation, or order heretofore issued relating to the departure of persons from, or their entry into, the United States; and compliance with the provisions of this proclamation, including the regulations of the Secretary of State incorporated herein and made a part hereof, shall not be considered as exempting any individual from the duty of complying with the provisions of any other statute, law, proclamation, rule, regulation, or order heretofore enacted or issued and still in effect.

5. I hereby direct all departments and agencies of the Government to co-

mation by reference, had been prescribed by the Secretary pursuant to the Act of May 22, 1918, as amended, supra, and were published as 22 CFR 53.1–53.9 (1949 ed.). Only sections 53.1 and 53.2 thereof (renumbered 53.2 and 53.3, respectively, in the 1958 revision of 22 CFR) are pertinent.[27]

operate with the Secretary of State in the execution of his authority under this proclamation and any subsequent proclamation, rule, regulation, or order issued in pursuance hereof; and such departments and agencies shall upon request make available to the Secretary of State for that purpose the services of their respective officials and agents. I enjoin upon all officers of the United States charged with the execution of the laws thereof the utmost diligence in preventing violations of section 215 of the Immigration and Nationality Act and this proclamation, including the regulations of the Secretary of State incorporated herein and made a part hereof, and in bringing to trial and punishment any persons violating any provision of that section or of this proclamation." 3 CFR 180–81 (1949–1953 Comp.).

**27.** "§ 53.2 *Limitations upon travel.* No citizen of the United States or person who owes allegiance to the United States *shall depart from or enter* into or attempt to depart from or enter into any part of the United States as defined in § 53.1, *unless he bears a valid passport which has been issued by or under authority of the Secretary of State* or unless he comes within one of the exceptions prescribed in § 53.3.

§ 53.3 *Exceptions to regulations in § 53.2.* No valid passport shall be required of a citizen of the United States or of a person who owes allegiance to the United States:

\* \* \* \* \*

(b) When traveling between the United States and any country or territory in North, Central, or South America *or in any island adjacent thereto: Provided,* That this exception shall not be applicable to any such person when traveling to or arriving from a place outside the United States for which a valid passport is required under this part, if such travel is accomplished via any country or territory in North, Central, or South America or any island adjacent thereto:" 22 CFR (1958 rev.) (Emphasis added.)

Section 1185(b) contains a general prohibition against the departure of a citizen from or entry into the United States unless he bears a valid passport. If it contained no limitation or exception, section 1185(b) would require "a valid passport" for every departure from the United States. But Congress authorized the President to make or to authorize the making of limitations upon and exceptions to this broad general prohibition. President Truman prescribed limitations upon and exceptions to the broad prohibition of section 1185(b) when, in his Proclamation No. 3004, January 17, 1953, he incorporated therein the regulations previously prescribed by the Secretary. The Secretary's regulations, like section 1185(b), contained and still contain the broad general limitation upon departure from and entry into the United States without a valid passport. 22 CFR 53.2 (1958 rev.). Section 53.3 thereof goes on to place limitations upon and exceptions to the broad general provision of section 53.2. It enumerates the circumstances under which "no valid passport" is required. But it states the exceptions in terms of "traveling between the continental United States" and certain specified places. When these regulations were incorporated into President Truman's Proclamation of 1953, one could depart and travel between the United States and a number of places including "any country or territory in North, Central or South America or in any island adjacent thereto," without a valid passport.

Under these regulations, at that time, one could, for example, depart for Canada, Mexico or Cuba (an island adjacent to North and Central America) without a passport. For travel between the United States and countries and territories other than those excepted by the regulations, a valid passport was required.

On January 16, 1961, the Secretary of State, by Loy W. Henderson, Deputy Under Secretary for Administration, amended 22 CFR 53.3(b) [28] by Departmental Regulation No. 108.456, 26 Fed.Reg. 482–83, so as to bring Cuba within the general provisions of section 53.2 (and, thereby, within the general provision of § 1185(b)). He stated therein that the amendment was made "Pursuant to the authority vested in me by paragraph 126 of Executive Order No. 7856, dated March 31, 1938," 3 Fed.Reg. 681–687,[29] and that said Executive Order had been issued pursuant to 22 U.S.C. § 211a [30] and 5 U.S.C. § 151c.[31] After reciting this authority, and out of context, there is inserted in the middle of this amendment (in parentheses) a citation of 8 U.S.C. § 1185 and Proclamation No. 3004. The parenthetical insertion does not state that the Secretary claims these cited provisions as authority for the amendment. One must assume, however, that, by this unexplained parenthetical insertion, the Secretary purported to amend his regulations not only pursuant to the authorities first cited in the introductory paragraph but also under the authority of § 1185 and Proclamation No. 3004.

---

**28.** "§ 53.3. *Exceptions to regulations in § 53.2.* No valid passport shall be required of a citizen of the United States or of a person who owes allegiance to the United States:

\* \* \* \* \*

(b) When traveling between the United States and any country, territory or island adjacent thereto in North, Central, or South America, excluding Cuba: \* \* \*." 26 Fed.Reg. 482–83, 22 CFR 53.3. (1965 ed.).

**29.** "126. The Secretary of State is authorized to make regulations on the subject of issuing, renewing, extending, amending, restricting, or withdrawing

passports additional to these rules and not inconsistent therewith."

**30.** See note 21, supra.

**31.** "§ 151c. Rules and regulations; promulgation by Secretary; delegation of authority

The Secretary of State may promulgate such rules and regulations as may be necessary to carry out the functions now or hereafter vested in the Secretary of State or the Department of State, and he may delegate authority to perform any of such functions, including if he shall so specify the authority successively to redelegate any of such functions, to officers and employees under his direction and supervision."

As so amended, Cuba was now placed in the same class with the countries of Europe with which we maintained diplomatic relations. Under the general provision of § 1185(b) and section 53.2 of the Secretary's regulations one was required to bear a valid passport if he departed for Europe or, for that matter, for any other country not excepted from the general provision. Under the general provision of section 1185(b) and of section 53.2 of the regulations one was required to have a valid passport merely because he was departing from the United States, except as limitations upon and exceptions to this requirement were authorized and prescribed by the President. If section 1185(b) empowered the President to place limitations upon *travel to* a particular country or territory one would expect that the Secretary would have incorporated prohibitions upon "travel to a country or territory" in his regulations. When section 53.3(b) of his regulations was amended, as aforesaid, however, the Secretary did not include in that amendment a provision invalidating outstanding passports for travel to or in Cuba or requiring that passports issued thereafter would not be valid for travel to or in Cuba unless specifically endorsed for such travel. Rather, on the same day when the Secretary so amended section 53.3 of his regulations, he made an announcement, in the form of a press release entitled "Restrictions on Travel to or in Cuba,"

thereafter published as Public Notice 179, 26 Fed.Reg. 492.[32] The authority he cited therein for this public notice is 22 U.S.C. § 211a and Executive Order No. 7856 of President Roosevelt issued back in 1938. Neither section 1185 nor its predecessor was in effect in 1938. President Roosevelt had issued this Executive Order under the authority of 22 U.S.C. § 211a. It is to be noted that this announcement by the Secretary is not published in the Code of Federal Regulations, but merely in the Federal Register where it appears under the section "Public Notices," not under Part 53 of Title 22 entitled "Travel Control of Citizens and Nationals in Time of War or National Emergency." On the other hand, the Secretary's amendment to 22 CFR § 53.3(b), supra, requiring a passport for travel between the United States and Cuba, is published under said Part 53. This suggests an awareness of the difference between departure regulations, promulgated under § 1185, and "travel to" regulations, promulgated under section 211a. For regulations, purporting to be promulgated under section 1185 are uniformly published in Part 53 of 22 CFR; those promulgated pursuant to section 211a are usually published in Part 51 ("Foreign Relations, Part 51–Passports") thereof, if they are published under any specified part.

The indictment charges the defendants with conspiracy to violate section 1185(b)

---

32. "Department of State
 (Public Notice 179)
 United States Citizens

Restrictions on Travel to or in Cuba

In view of the conditions existing in Cuba and in the absence of diplomatic relations between that country and the United States of America I find that the unrestricted travel by United States citizens to or in Cuba would be contrary to the foreign policy of the United States and would be otherwise inimical to the national interest.

Therefore pursuant to the authority vested in me by Sections 124 and 126 of Executive Order No. 7856, issued on March 31, 1938 (3 F.R. 681, 687, 22 CFR 51.75 and 51.77) under authority of Section 1 of the Act of Congress approved July 3, 1926 (44 Stat. 887, 22 U.S.C. 211a), all United States passports are hereby declared to be invalid for travel to or in Cuba except the passports of United States citizens now in Cuba. Upon departure of such citizens from Cuba, their passports shall be subject to this order.

Hereafter United States passports shall not be valid for travel to or in Cuba unless specifically endorsed for such travel under the authority of the Secretary of State or until this Order is revoked.

Dated: January 16, 1961

 For the Secretary of State
 Loy Henderson,
 Deputy Under Secretary for
 Administration."

"and the regulations issued thereunder" and with having departed from and entered the United States in violation of section 1185(b). The public notice of the Secretary, not § 1185(b) or "the regulations issued thereunder," purports to render United States passports not valid for travel to or in Cuba unless specifically endorsed for such travel.

### What is a Passport?

The word "passport" derives from the early modern French "passeport" ("passe," he passes plus "port" or harbour).[33] The Act of May 22, 1918, supra, did not define "passport."[34] The President, however, defined it in his Executive Order No. 2932, supra, entitled "Rules and Regulations Governing the Issuance of Permits to Enter and Leave the United States," as follows:

> "Sec. 5. The term 'passport' as used herein includes any document in the nature of a passport issued by the United States or by a foreign government, which shows the identity and nationality of the individual for whose use it was issued and bears his signed and certified photograph."

This definition accords with that of Green Hackworth,[35] while Legal Advisor to the Department of State. He gave the traditional definition in 1942—before the Supreme Court recognized exit control as the "crucial function" of a passport in Kent v. Dulles, infra.

The Supreme Court has defined "passport" in two noteworthy opinions. In Urtetiqui v. D'Arcy, 9 Pet. (34 U.S.) 692, 699, 9 L.Ed. 276 (1835), the Court, holding a passport inadmissible as proof of citizenship, said:

> "It is a document which, from its nature and object, is addressed to foreign powers; purporting only to be a request that the bearer of it may pass safely and freely; and is to be considered rather in the character of a political document, by which the bearer is recognized in foreign countries as an American citizen; and which, by usage and the law of nations, is received as evidence of the fact."

In Kent v. Dulles, 357 U.S. 116, 121, 129, 78 S.Ct. 1113, 1115, 1120, 2 L.Ed.2d 1204 (1958), the Court quoted this statement from Urtetiqui as to the function of a passport and continued:

> "[T]hat function of the passport is subordinate. Its crucial function today is control over exit."

In Worthy, supra, 328 F.2d at 391, the Court of Appeals for the Fifth Circuit gave a definition which, in effect, combined those in Urtetiqui and Kent and added a "travel to" component:

> "A passport is evidence of the permission of the sovereign to its citizen au-

33. Partridge, Origins, A Short Etymological Dictionary of Modern English 461 (2d ed. 1959); Hunt, The American Passport (Department of State, 1898).

34. "CHAP. 81. An Act To prevent in time of war departure from or entry into the United States contrary to the public safety.
 * * * [W]hen the United States is at war, if the President shall find that the public safety requires that restrictions and prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful—
 * * *
 Sec. 2. * * * except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, * * * for any citizen of the United States to depart from or enter or attempt to depart from or enter the United States unless he bears a valid passport."

35. "The American passport is a document of identity and nationality issued to persons owing allegiance to the United States and intending to travel or sojourn in foreign countries. It indicates that it is the right of the bearer to receive the protection and good offices of American diplomatic and consular officers abroad and requests on the part of the Government of the United States that the officials of foreign governments permit the bearer to travel or sojourn in their territories and in case of need to give him all lawful aid and protection. It has no other purpose." 3 Hackworth, Digest of International Law 435 (1942).

*thorizing him to travel to foreign countries* and to return to the land of his allegiance, as well as a request to foreign powers that the person to whom it has been issued may be allowed to pass freely and safely." (Emphasis added.)

The definition in *Urtetiqui,* as expanded in *Kent,* is supported by the history of passports and documents in the nature of passports,[36] as well as by the opinions of the deans of many law schools and several professors of law.[37] The court in *Worthy,* supra, cites no authority for its "travel to" aspect of a passport. This court cannot accept the *Worthy* definition as applicable to the instant criminal prosecution for having *departed from* the United States without a valid passport.

No statutory definition of "passport" (prior to the enactment of the Immigration and Nationality Act of 1952, 66 Stat. 163, 166, 8 U.S.C. § 1101 et seq.), has been found. Section 101(a) (30) of that Act (8 U.S.C. § 1101(a) (30) defines "passport" as follows:

> "(30) The term 'passport' means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the entry of the bearer into *a* foreign country." (Emphasis added.)

Prior to this Act of 1952, the predecessor of section 1185 was included in Title 22 of the United States Code, entitled "Foreign Relations and Intercourse." This section of the Code was repealed when its substance was incorporated into the Immigration and Nationality Act of 1952 as section 215 (8 U.S.C. § 1185). This Act relates primarily to immigrant aliens. This statutory definition, in terms of "entry * * * into a foreign country," stated in an omnibus Immigration and Nationality Act, casts little light upon the meaning of a criminally punitive provision (albeit incorporated into and engrafted upon that Act) for departure from the United States without a valid passport.

### *What is a Valid Passport?*

Prior to 1856, various federal, state and local officials and notaries public had undertaken to issue either certificates of citizenship or other documents in the nature of letters of introduction to foreign officials, requesting treatment by them of the bearer according to the usages of international law. Congress put an end to such practices by the Act of August 18, 1856, 11 Stat. 52, 60–61, 22 U.S.C. § 211a. Kent v. Dulles, supra, 357 U.S. at 123, 78 S.Ct. at 1117. After this enactment only passports issued by the Secretary were "valid passports." The statutory definition of "passport" in 8 U.S.C. § 1101(a) (30), supra, when read in conjunction with § 211a, makes it clear that the Secretary is the only "competent authority" who may issue a valid passport. 8 U.S.C. § 1101(a) (30) defines "passport" in terms of entry of its bearer into "a foreign country." The passports issued to the defendants were valid "for the entry of the bearer into *a* foreign country" (emphasis added), though, as contended by the Government, they may not have been valid for entry into a *particular* foreign country, namely Cuba. Were there an act of Congress making it a crime for a citizen to *enter* Cuba without a valid passport and had the defendants been indicted for a violation thereof, this definition in 8 U.S.C. § 1101(a) (30) would be applicable, sub-

---

36. See Hunt, op. cit. supra, note 33 at 1–6; Riesman, Legislative Restrictions on Foreign Enlistment and Travel, 40 Colum. L.Rev. 793, 815–22 (1940); testimony of R. W. Scott McLeod, Administrator, Bureau of Security and Consular Affairs, Department of State, Hearings Before Subcommittee No. 1, Committee on the Judiciary, House of Representatives, 84th Cong., 2d Sess., on H.R. 9991, ser. 24, at

4–10 (1956); Special Committee to Study Passport Procedures of the Association of the Bar of the City of New York, Freedom To Travel 18–22 (1958).

37. See The Right to Travel and United States Passport Policies (a staff study prepared for the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate), Senate Doc. No. 126, 85th Cong., 2d Sess. (1958).

ject only to its surviving judicial scrutiny upon constitutional grounds.

### The Form of Passports Issued by the Secretary

The first page of a passport issued by the Secretary indicates what a passport is:

"The Secretary of State
of The
United States of America

hereby requests all whom it may concern to permit the citizen(s) of the United States named herein to pass without delay or hindrance and in case of need to give said citizen(s) all lawful aid and protection."

On the inside of the front cover appears a printed notice to the effect that it is not valid until signed by the person to whom it is issued:

"IMPORTANT

This passport is NOT VALID until signed BY THE BEARER on page two."

On the inside of the back cover it contains a printed warning as to the consequences of its use in violation of the conditions or restrictions contained therein:

"VIOLATION OF CONDITIONS OR RESTRICTIONS

If you use or attempt to use this passport in violation of the conditions or restrictions contained in it, you may lose the protection of the United States while you continue to reside abroad, and you may be liable for prosecution (Section 1544, Title 18, U.S. Code)."

Only following the January 1961 amendment of the Secretary's regulations and his press release, supra, did passports include a stamped notice (as did

those of the defendants Martinot and Schlosser) that one who *travels to or in* a proscribed area *"may be* liable for prosecution" not only under Section 1544, Title 18, U.S.Code [38] but also under "Section 1185, Title 8, U.S.Code."

It would appear that, during all of the time that section 1185 and its predecessor were in effect (prior to January 16, 1961), the Secretary's administrative interpretation of applicable law was that 18 U.S.C. § 1544 was the only criminal sanction enacted by Congress for the use of a passport "in violation of the conditions or restrictions therein contained" and did not consider section 1185 or its predecessor applicable.

One can understand the refusal of the Secretary to issue a passport or to validate a passport of one who intends to use it upon entry into a country with which the United States does not maintain diplomatic relations. Since we are not on speaking terms with such a country, the Secretary does not desire to make any requests of "all whom it may concern" in that country. It does not follow that a passport "not valid" for purposes of the Secretary's request to "all whom it may concern" is not valid for purposes of departure from and entry into the United States.

### Departure Procedure

Before one boards an airplane at Kennedy Airport on a flight to Europe, for example, he must exhibit an unexpired passport issued to him by the Secretary. No employee of any United States government agency examines such passports. Rather, they are exhibited to and examined by employees of the airline at its departure counter. 8 U.S.C. § 1221(b) mandates the commanding officer of an

---

38. "§ 1544. Misuse of passport
Whoever willfully and knowingly uses, or attempts to use, any passport issued or designed for the use of another; or
Whoever willfully and knowingly uses or attempts to use any passport in violation of the conditions or restrictions therein contained, or of the rules prescribed pursuant to the laws regulating the issuance of passports; or

Whoever willfully and knowingly furnishes, disposes of, or delivers a passport to any person, for use by another than the person for whose use it was originally issued and designed—
Shall be fined not more than $2,000 or imprisoned not more than five years, or both."

aircraft taking on passengers at any port of the United States, who are destined to any place outside the United States, to file with the immigration officer "before departure" a list of all such persons in such form and containing such information "as the Attorney General shall prescribe by regulation as necessary for the identification of the persons so transported and for the enforcement of the immigration laws." (It is to be recalled that section 1185 is a section of the "immigration laws.") Until this requirement is complied with, no commanding officer of such an aircraft "shall be granted clearance papers for his * * * aircraft." As to aircraft which are determined to be making regular trips to the United States, "the Attorney General may, when expedient, arrange for the delivery of lists of outgoing persons at a later date."

The Attorney General's regulations prescribe that a manifest be executed on Form I–94. As to American citizens departing from the United States, only the name, nationality, United States address and passport number of the passenger, in addition to identification of the flight, are required. Presentation of this manifest to the immigration officer at the port of departure may be deferred "for a period not in excess of 30 days." 8 CFR § 231.2 (1965 rev.). The record indicates that the manifests of those aboard the several aircraft on which the defendants and the other members of the group departed from the United States were not so presented by the respective airlines until the day after their respective departures. In effect, the Attorney General has delegated to the commercial airlines the duty of preventing departure from the United States without a valid passport. Form I–94 suggests that a passport is valid for departure if issued by the Secretary and not yet expired. There is nothing in the Attorney General's said regulations which equates departure from the United States with entry into an area proscribed by the Secretary. All that his regulations require of a citizen who is to depart from the United States is that he be the bearer of an unexpired passport issued by the Secretary.

If section 1185(b) means what the Government now contends, this practice as to the departure of citizens from the United States falls woefully short of "the utmost diligence in preventing violations of section 215 of the Immigration and Nationality Act [§ 1185] and this proclamation" enjoined "upon all officers of the United States charged with the execution of the laws thereof" by President Truman in Proclamation 3004 of January 17, 1953.[39] If, on the other hand, section 1185(b) is what it purports to be, i. e., a departure and entry statute, this departure procedure comports with "the immigration laws," and the provision of § 1185(c) thereof, subjecting the aircraft to forfeiture, is not as Draconian as it might otherwise be.

### When is the Crime Committed?

If section 1185(b) is more than a departure statute; if the ultimate destination of a passenger, rather than his departure from the United States, comes within this criminal statute, when is the crime committed? The Government contends that it is committed the moment a citizen departs from the United States with the intention of ultimately going to a proscribed area. If, for example, a citizen so departed with the intention of entering Cuba but changed his mind after he arrived in London or Paris and did not continue on to Cuba, he would nevertheless have violated this criminal statute, according to the Government. He would have committed what the Government characterizes as "a technical violation." The Government refused to take a position in the supposititious case of a citizen who departs from the United States with no intention of continuing on to Cuba but, after arrival in London or Paris, changes his mind and does so proceed.

---

39. See note 26, supra.

### *Doubts as to the Applicability of section 1185(b) as a "travel to" statute*

The Special Committee of the Association of the Bar of the City of New York To Study Passport Procedures, composed of distinguished partners of some of the outstanding law firms in New York City and Adrian S. Fisher, now chief reporter of the American Law Institute's Restatement of the Foreign Relations Law of the United States, published its report in 1958. After considering all of the federal statutes (including section 1185) prescribing penalties for violations of travel restraints, it came to the following conclusion:

"The Committee has not discovered any statute which clearly provides a penalty for violation of area restrictions, and this seems to be a glaring omission if the United States is seriously interested in the establishment and enforcement of travel controls. Knowing violation of valid restrictions should certainly be subject to an effective sanction, which is not now the case." [40]

The Department of State issued a press release on May 1, 1952, announcing that it was taking additional steps "to warn American citizens of the risks of travel in Iron Curtain countries by stamping all passports not valid for travel in those countries unless specifically endorsed by the Department of State for such travel." Nevertheless, in that press release "the Department emphasized that this procedure in no way forbids American travel to those areas." [41] This press release implies a recognition by the Secretary that his regulations, as reflected in passports stating that they are not valid for travel

to or in a particular area, may, as a practical matter, constitute an obstacle but not a barrier to such travel. As I read the opinion of the Supreme Court in *Zemel*, supra, it held merely that, when Congress enacted 22 U.S.C. § 211a, it authorized the Secretary to impose area restrictions and to refuse to validate a United States passport for travel to any such area. The Supreme Court did not pass upon the question of whether the exercise of this power, which it read into section 211a, constitutes not only an obstacle but also a barrier, i. e., whether the Secretary has the further power to forbid travel by a United States citizen to such an area and, thereby, to make such travel a crime within the scope of 8 U.S. C. § 1185(b). "But whether or not the new legislation was intended to attach criminal penalties to the violation of area restrictions, it certainly was not meant to cut back upon the power to impose such restrictions." *Zemel*, supra, 381 U.S. at 12, 85 S.Ct. at 1278.

In May 1956, R. W. Scott McLeod, Administrator of the Bureau of Security and Consular Affairs of the Department of State, testified before Subcommittee No. 1 of the House Committee on the Judiciary with reference to the Immigration and Nationality Act of 1952, supra. By this time a number of cases concerning passport denials were either pending or had been decided at the district court and circuit court levels. [42] Mr. McLeod, in discussing the Act, including section 1185, said in substance that, in his opinion, a United States citizen may leave the United States without any passport for any part of the Western Hemisphere (including Cuba, since the Secretary's amendment to 22 CFR 53.3(b) was not

---

40. Freedom To Travel 70 (1958).

41. Hearings Before Senate Foreign Relations Committee on Department of State Passport Policies, 85th Cong., 1st Sess., at 3 (1957).

42. Nathan v. Dulles, 129 F.Supp. 951 (D. D.C.1955). See also 96 U.S.App.D.C. 190, 225 F.2d 29 (1955); Shachtman v. Dulles, 96 U.S.App.D.C. 287, 225 F.2d 938 (1955); Robeson v. Dulles, 98 U.S.App.

D.C. 313, 235 F.2d 810, cert. denied, 352 U.S. 895, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956); Boudin v. Dulles, 136 F.Supp. 218 (D.D.C.1955), modified 98 U.S.App. D.C. 305, 235 F.2d 532 (1956); Kent v. Dulles, pending in the D.C. Circuit Court of Appeals 1956, see 101 U.S.App.D.C. 278, 248 F.2d 600 (1957); Briehl v. Dulles, pending in the D.C. Circuit Court of Appeals in 1956, see 101 U.S.App.D.C. 239, 248 F.2d 561 (1957).

made until 1961); that having so departed, the citizen may travel elsewhere subject only to the laws of the country of his destination:

"As has been noted, you may leave the United States for any part of the Western Hemisphere without a passport. True, if it is your intention to transit other parts of the Western Hemisphere and to go outside of it, under our law you are required to have a passport; but for those who would circumvent the law, certainly the opportunity exists to travel without a passport. And once they have left the United States, any inhibitions on travel abroad are not as a result of our laws, but the laws of other countries." [43]

This view was not shared by the court in United States v. Travis, supra. Nevertheless, it does reflect administrative interpretation of the scope of section 1185 (b) by the Department of State.

On June 16, 1958, the Supreme Court handed down its opinion in Kent v. Dulles, supra. The decision in *Kent* turned upon the question as to whether § 1185 and § 211a delegated to the Secretary authority to deny passports to the plaintiffs upon the ground that they were Communists. The Court approached the problem from the standpoint of the fundamental "exercise by an American citizen of an activity [the right to travel] included in constitutional protection," stating that it:

"[would] not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it. * * * And, as we have seen, the right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment. *If that 'liberty' is to be regulated, it must be pursuant to the lawmaking functions of the Congress.* * * * And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests. * * * Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them. * * * They may or may not be Communists. But assuming they are, the only law which Congress has passed expressly curtailing the movement of Communists across our borders has not yet become effective. It would therefore be strange to infer that pending the effectiveness of that law, the Secretary has been silently granted by Congress the larger, the more pervasive power to curtail in his discretion the free movement of citizens in order to satisfy himself about their beliefs or associations. * * * We would be faced with important constitutional questions were we to hold that Congress by § 1185 and § 211a had given the Secretary authority to withhold passports to citizens because of their beliefs or associations. Congress has made no such provision in explicit terms; and absent one, the Secretary may not employ that standard to restrict the citizens' right of free movement." 357 U.S. at 129–130, 78 S.Ct. at 1120. (Emphasis added.)

"We need not decide the extent to which it can be curtailed." 357 U.S. at 127, 78 S.Ct. at 1119.[44]

On July 7, 1958, less than one month after this decision, President Eisenhower sought to enlist "the lawmaking functions of the Congress" in a special message seeking legislation which would grant to the Secretary "clear statutory authority to prevent Americans from *using passports for travel to areas* where there is no means of protecting them, or where their presence would conflict with our foreign policy objectives or be inimical to the security of the United States."

43. Hearings, 84th Cong., 2d Sess., on H.R. 9991, ser. 24, at 4 (1956).

44. The Court was referring to section 6 of the Subversive Activities Control Act of 1950, 64 Stat. 993, 50 U.S.C. § 785, which was later held unconstitutional in Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

H.R.Doc. No. 417, 104 Cong.Rec. 11849, 1958 U.S.Code, Cong. and Admin.News, 85th Cong. 2d Sess. 5465. (Emphasis added.) The Secretary drafted a proposed bill to carry out the President's recommendations, which was introduced as H.R. 13318 by Congressman Keating of New York. It proposed to consolidate all federal law relating to passports into the "Passport Act of 1958." Section 402 thereof would have prohibited *"travel to or in any country or area* which to his [the holder of a United States passport] knowledge has been designated by the Secretary of State" as an area inappropriate for travel by United States citizens. (Emphasis added.) One who violated this provision would be guilty of a misdemeanor. This, obviously, was to be a "travel to" statute, supplementary to section 1185, a departure statute. Understandably, therefore, section 602 of this bill provided:

"602. Nothing in this Act shall be construed to limit, amend or repeal the provisions of section 215 of the Act of June 27, 1952, chapter 477, title II, chapter 2, (8 U.S.C. sec. 1185)."

The House Committee on Foreign Affairs considered this bill. It did not report it out because it felt that the Secretary's bill was too broad.[45] This statutory authority sought by the Secretary but not granted by the Congress is the very power claimed by the Government in the instant case.

22 U.S.C. § 211a is a passport statute. 8 U.S.C. § 1185 is, by its terms, a departure statute. This distinction must be recognized. It has been recognized by the Department. It submitted written replies to questions put to one of its representatives, who appeared before the House Committee on Foreign Affairs in

1958 when it was considering a bill (S. 2770), introduced by Senator Fulbright of Arkansas:

"The Department believes that passports should be denied, even in peacetime and in the absence of a national emergency, to law violators and to Communist supporters, whether or not passports are required for departure from the United States. *The problem here lies in the distinction between passport issuance and the control of travel, two concepts which are intermingled throughout the Fulbright bill but which are separate under existing law and which in our belief should remain separate."* [46] (Emphasis added.)

Several other bills were introduced which sought to empower the President to restrain the travel of United States citizens and to limit the validity of passports with respect to travel to certain countries or areas declared by the President to be "off limits" and to prohibit travel to any such country or area. H.R. 9069, 86th Cong., 1st Sess. (1959) sought to restrain travel by an amendment to § 211a. The favorable report of the Committee on Foreign Affairs considered this bill as one which would add specific statutory authority for the President to restrain travel.[47] It was not enacted into law. Another bill, H.R. 388, 87th Cong., 1st Sess. (1961), proposed to amend section 1185(b) so as to add a provision making it "unlawful for any citizen of the United States to * * * (2) travel to any country in which his passport is declared to be invalid. * * *"[48] It was not enacted into law. H.R. 9045, 88th Cong., 1st Sess. (1963) would have amended section 1185(b) by adding to the departure and entry provi-

---

45. See H.R. Rept. No. 2684, 85th Cong., 2d Sess. 4 (1958).

46. Hearings Before House Committee on Foreign Affairs, 85th Cong., 2d Sess. 28 (1958).

47. *"Geographical limitations.* The bill adds to existing law specific authorization for

the President to restrain the travel of all citizens and limit the validity of all passports for designated areas." H.R. Rept. No. 1151, 86th Cong., 1st Sess. 4 (1959).

48. The present prohibition against departure from and entry into the United States without a valid passport was to remain in § 1185(b).

**456**

sions thereof, as further crimes by United States citizens:

> "(2) *travel to, enter or travel in* or through any country or area, unless he bears a passport specifically endorsed for and authorizing such travel or entry therein; or
>
> (3) *travel to, enter, or travel in* or through any country or area to which travel by United States citizens has been prohibited by the President." (Emphasis added.)

This bill was not enacted into law. H.R. 11621, 88th Cong., 2d Sess. (1964) would have added a new section to 8 U.S.C., immediately following section 1185. Thus the departure and entry statute, section 1185, would have remained in effect. A new section would have related to entry into a proscribed area, for a violation of which the penalty would be a fine of up to $10,000 or imprisonment of up to two years, or both. This bill was not enacted into law, nor was an identical bill, H.R. 11603, 89th Cong., 1st Sess. (1964).

S. 806, 86th Cong., 1st Sess. (1959), introduced by Senator Humphrey "(for himself, Mr. Anderson, Mr. Chavez, Mr. Hennings, Mr. Morse, Mr. Neuberger and Mr. Symington)" reflected a more liberal attitude toward the right of United States citizens to travel. It would have repealed § 1185(b) and other statutes inconsistent with the Humphrey bill; would have subjected the right to travel only "to the war power granted to the President and the Congress"; would have authorized the Secretary to refuse or limit the issuance of passports only (1) following a declaration of war by the Congress, (2) following the outbreak of hostilities in which the Armed Forces of the United States participate or (3) upon the application of a person under indictment, information or sentence for the commission of a felony. As to area restrictions under other circumstances (such as lack of diplomatic relations), the President would be empowered only

to determine that the United States may not be able to give its usual protection to citizens travelling in designated areas. In the event of such a determination, it would devolve upon the Secretary to so inform each passport applicant. Nevertheless "The President shall not forbid travel in these areas by persons under this Act." This bill acknowledges the distinction between the designation of an "off limits" area, on the one hand, and the right of a citizen to enter such an area at his own risk. It was drafted (as it stated) with a realization and proposed finding "that freedom of movement is basic in the scheme of American institutions" and that "the crucial function of a passport is control over entry or exit." This is what the Supreme Court said in Kent v. Dulles, supra. This bill, likewise, was not enacted into law.[49]

*Section 1185(b) is a Criminal Statute*

 The cardinal principle that a "criminal statute is to be construed strictly, not loosely," United States v. Boston & Maine R.R., 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965), "is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." United States v. Wiltberger, 5 Wheat. (18 U.S.) 76, 95, 5 L.Ed. 37 (1820). It requires no further citation to support the equally cardinal principle that the power of punishment is not vested in the executive department. If, arguendo, the use of the phrase "valid passport" in section 1185(b) creates an ambiguity, the court is bound to resolve any ambiguity in favor of the defendants. Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). There is a greater compulsion to construe strictly a criminal statute affecting the right of exit which the Supreme Court has classified as "a personal right included within the word 'lib-

49. Many other bills have been introduced in the Congress relating to area restrictions, passport control in general, members and supporters of the International Communist movement—none of which has been enacted into law.

erty' as used in the Fifth Amendment." Kent v. Dulles, supra. The Government seeks to read into an exit and entry statute the pronouncement of the Secretary in his press release of January 16, 1961, supra.

*Legislative History Does Not Support the Government's Contention*

Nothing in the history of the Act of May 22, 1918, supra, the Act of June 21, 1941, supra, or 8 U.S.C. § 1185 suggests that they or any of them were anything more than border control statutes regulating departure from and entry into the United States.

■ The enactment of § 1185 in 1952 has no independent legislative history.[50] However, since § 1185(b) is cast in language almost identical to that of the Acts of May 22, 1918 and June 21, 1941, one may ascertain the intent of the Congress by examining the history of those earlier acts.[51]

The Committee Reports[52] and Congressional Debates[53] as to both the Act of May 22, 1918 and its amendment by the Act of June 21, 1941, clearly indicate that the Congress and the President,[54] in those years respectively, were concerned with the uncontrolled departure and entry of citizens of the United States, who, it was believed, were acting in furtherance of the war efforts of foreign powers and to the detriment of the interests of the United States. A system of border control was necessary.[55] The manner settled upon to control ingress and egress was to require all American citizens to bear passports upon departure from and entry into the United States. So, in 1918 and then again in 1941, Congress enacted statutes which made unlawful the departure and entry of American citizens without passports. Since, for example, the Secretary of State would not issue a passport to a citizen of the United States who, in 1918, was acting in furtherance of Germany's war efforts, an entry or departure by such citizen without a passport would violate the predecessor of § 1185(b).

Congress recognized that this absolute restriction might work hardships, unnecessarily, on loyal Americans.[56] Therefore, in enacting these statutes, Congress authorized the President to promulgate exceptions to and limitations upon this absolute restriction. The President was authorized to and did except certain categories of persons from the operation of this restriction. Military and naval personnel, as well as other classes of government personnel, were permitted to depart and enter without bearing valid passports.[57] Americans travelling between the United States and Canada, likewise, were not required to be the bearers of valid passports upon departure and entry (this exception was eventually expanded

---

50. Only one statement about this section appears in the House Report.
"The powers of the President to provide additional prohibitions and restrictions on the entry and departure of persons during time of war or the existence of a national emergency are incorporated in the bill (sec. 215) in practically the same form as they now appear in the act of May 22, 1918 (40 Stat. 559)." H.R.Rept. No. 1365, 82d Cong., 2d Sess. 53 (1952).

51. See Kent v. Dulles, 357 U.S. 116, 137, 78 S.Ct. 1113, 1124, 2 L.Ed.2d 1204 (1958) (dissenting opinion); United States v. Plesha, 352 U.S. 202, 205, 77 S.Ct. 275, 277, 1 L.Ed.2d 254 (1957).

52. H.R.Rept. No. 485, 65th Cong., 2d Sess. (1918); S.Rept. No. 444, 77th Cong., 1st Sess. (1941).

53. See 56 Cong.Rec. 5969–70, 6029–31, 6062, 6064–68, 6192–93, 6195, 6246–47 (1918); 87 Cong.Rec. 4806, 5047–49, 5052 (1941).

54. H.R.Rept. No. 485, 65th Cong., 2d Sess. 2 (1918). See also Annual Report of the Attorney General of the United States for the Year 1917, 16 (1917).

55. See e. g., H.R.Rept. No. 485, 65th Cong., 2d Sess. 2, 3 (1918); S.Rept. No. 444, 77th Cong., 1st Sess. (1941); 87 Cong. Rec. 5047–49 (1941).

56. 56 Cong.Rec. 6029–31, 6062, 6065, 6193, 6246–47 (1918).

57. See e. g., Exec. Order No. 2932, August 8, 1918, Laws Applicable to Immigration and Nationality 1050 (1953 ed.).

458

to include the entire Western Hemisphere).[58] When Congress enacted § 1185 in 1952, *these* were the powers of the President as they existed under the Act of May 22, 1918, as amended by the Act of June 21, 1941.[59]

There is nothing in the history of these Acts from which one may reasonably infer that Congress intended to grant the executive branch of the Government the power to subject to criminal penalties a United States citizen who departs from or enters the United States bearing an unexpired passport issued by the Secretary, even though he travels to an area proscribed by the Secretary.

The Secretary, at least since 1914, has exercised the power to declare passports invalid for use in or travel to specified countries and areas (i. e., to impose area restrictions) and to refuse to validate passports for travel to said countries or areas.[60] This authority stems from 22 U.S.C. § 211a.[61] It clearly does not stem from § 1185 or its predecessor since the Secretary has exercised the power whether or not these statutes were in effect.[62] Furthermore, even while § 1185 has been in effect, the Secretary has not cited it as authority for such restrictions upon the use of passports. On the contrary, when he cited any authority, it was § 211a.[63] The imposition of such restrictions was not limited to instances of war or a national emergency. These two statutes and the regulations and restrictions under each of them relate to different problems. § 1185(b) and the regulations thereunder are directed against the subversive transference of military information and espionage for foreign enemy governments by citizens of the United States during time of war or national emergency.[64] The regulations under §

---

58. Ibid. See also Exec. Order No. 3326, Sept. 17, 1920, id. at 1065; 22 CFR 58.3 (1941 Supp.) ; 22 CFR 53.3(b) (1958 rev.).

59. See note 50, supra.

60. See Dep't of State, Circulars Relating to Citizenship—1915, 48 (1915).

61. Zemel v. Rusk, supra. See also Exec. Order No. 7856, 3 Fed.Reg. 681 (1938). Prior to the Supreme Court decision in Zemel v. Rusk, a number of lower courts had concluded that the power to impose area restrictions on passports, and to refuse to validate passports for travel to restricted areas, was granted by § 1185. See e. g., Worthy v. Herter, 106 U.S.App. D.C. 153, 270 F.2d 905, 912, cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959); MacEwan v. Rusk, 228 F.Supp. 306, 310–312 (E.D.Pa.1964), aff'd, 344 F.2d 963 (3d Cir. 1965). The District Court in *MacEwan* went further, concluding that travel to Cuba without a specially validated passport would violate § 1185. 228 F.Supp. at 315 (civil suit). See also United States v. Healy, 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964) (dictum). The Supreme Court, however, in *Zemel*, purposefully refused to reach either of these conclusions, specifically holding that "area restrictions" were authorized by § 211a.

62. See note 60, supra. See also 3 Hackworth, Digest of International Law 531–33 (Spain and China) ; 4 Fed.Reg. 176 (Europe).

63. See e. g., Public Notice 179, 26 Fed. Reg. 492 (1961) (Cuba).

64. H.R.Rept. No. 485, 65th Cong., 2d Sess. 2, 3 (1918):
"That some supervision of travel by American citizens is essential appeared from statements made before the committee at the hearing upon the bill. One case was mentioned of a United States citizen who recently returned from Europe after having, to the knowledge of our Government, done work in a neutral country for the German Government. There was strong suspicion that he came to the United States for no proper purpose. Nevertheless not only was it impossible to exclude him but it would now be impossible to prevent him from leaving the country if he saw fit to do so. The known facts in his case are not sufficient to warrant the institution of a criminal prosecution, and in any event the difficulty of securing legal evidence from the place of his activities in Europe may easily be imagined."
87 Cong.Rec. 5047–48 (1941):
"Since the outbreak of the present war in Europe the Department of State has from time to time given consideration to the desirability of the modification of the act of May 22, 1918 * * * in such a manner as to permit the President, at a time such as the present, to prescribe rules and regulations governing the entry into and the departure from the United States of

211a, i. e., the "travel to" restrictions, are directed toward preventing American citizens from travelling to countries where they may be subject to personal risks (such as countries in which famine or civil war is raging) [65] or travelling to countries in which it will be difficult or impossible for the United States to offer them diplomatic protection,[66] i. e., countries with which the United States does not maintain diplomatic relations.

When the Acts of May 22, 1918 and June 21, 1941, were enacted, "travel to" restrictions were in effect by virtue of regulations issued prior to their effective dates.[67] That these statutes were not intended to encompass or embrace the "travel to" restrictions of these regulations is clear from the language of the statutes. These statutes were to become effective when "the President shall find

all persons, if he deems that the interests of the United States so require * * * [T]here is no provision of law under which citizens of the United States may be required to bear valid passports in order to depart from or enter the United States or under which the departure from the United States of aliens may be controlled. Since the outbreak of the present war it has come to the attention of the Department of State and of other executive departments that there are many persons in and outside of the United States who are directly engaged in espionage and subversive activities in the interests of foreign governments, and others who are engaged in activities inimical to the best interests of the United States who desire to travel from time to time between the United States and foreign countries in connection with their activities, as well as others who desire to leave the United States for the purpose of evading justice.

During the last war, when it is believed a lesser number of persons were engaged in espionage and subversive activities *in the United States* than is now the case, notwithstanding the fact that the United States is not at war, it was found desirable to enact legislation to provide for the regulation of travel to and from the United States on the part of all persons, citizens as well as aliens. The situation existing throughout the world and the necessity of promoting as far as possible the national defense justify, it is

* * * that restrictions and prohibitions *in addition to those provided otherwise than by this Act*," were necessary. Further, § 1185 and its predecessor were only to become effective when the President found that additional restrictions and prohibitions should "be imposed upon the *departure of persons from and their entry into the United States*," not additional restrictions as to countries Americans would be permitted to visit.

If the Congress, by enacting § 1185(b) and its predecessor, intended to prohibit travel to proscribed areas as well as to prohibit departure and entry without passports, one may reasonably wonder why the Congress did not expressly provide for such a prohibition. The principle that when the Congress "has the will it has no difficulty in expressing it," Bell v. United States, 349 U.S. 81, 83,

believed, the enactment of legislation providing for the centralization of control over the entry into and departure from the United States of persons of all classes. It is believed that this could be accomplished by the modification of the first paragraph of the act of May 22, 1918, so that the President could issue rules and regulations governing the entry into and departure from the United States of all persons. * * * *" (Emphasis added.)

65. See e. g., famine in Belgium, 3 Hackworth, op. cit. supra, note 62 at 526; civil war in Spain, id. at 531–33. See also, Right to Travel 14–18 (1958).

66. "Generally speaking, the United States will not validate passports for travel to countries with which we do not have diplomatic relations. Americans travelling to such countries cannot be extended the usual protection offered American citizens and property abroad by our embassies and consulates abroad. * * *

In addition to not validating passports for countries with which we have no diplomatic relations, the Secretary of State may, from time to time, decide that the safety of American citizens cannot be fully protected in certain countries." Statement of Deputy Under Secretary of State, Robert D. Murphy, Hearing Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, 85th Cong., 1st Sess., pt. 2, at 101 (1957).

67. See notes 60 and 62, supra.

75 S.Ct. 620, 622, 99 L.Ed. 905 (1955), is pertinent. For, in 1939, two years prior to the Act of June 21, 1941, Congress, by joint resolution, The Neutrality Act of 1939, 54 Stat. 4, 7, 11, specifically gave the President the authority to prohibit travel of Americans to certain areas to be designated either by the President or one to whom he delegated this power. Sections 1(a), 3, 13. It provided, further, for criminal penalties for a violation of the President's "travel to" restrictions.[68] The Neutrality Act of 1939, was still in effect when the predecessor of § 1185(b) was enacted in 1941.[69] There is nothing to indicate that the Congress intended, *sub silentio*, to include these "travel to" restrictions, imposed under this act, in the departure and entry statute, the border control statute it enacted two years later.

## CONCLUSION

The court finds that the defendants Laub and Martinot departed from and entered the United States bearing valid passports within the meaning of "depart," "enter" and "valid passport" in 8 U.S.C. § 1185(b); that, although they and the defendant Schlosser agreed among themselves and with the other alleged co-conspirators named in the indictment to induce others to do likewise and acted in furtherance thereof, the said agreement and the said acts do not constitute a crime under 18 U.S.C. § 371. If, as the court concludes, there is a gap in the law, the right and the duty, if any, to fill it devolves upon the legislative, not the executive or judicial, branch of the Government.

This opinion constitutes the court's findings of fact and conclusions of law. Settle any further proposed findings and conclusions and a proposed order on or before fifteen (15) days from the date hereof.

68. "Whenever the President shall have issued a proclamation [that a state of war exists between foreign states] and he shall thereafter find that the protection of citizens of the United States so requires, he shall, by proclamation, define combat areas, and thereafter it shall be unlawful, except under such rules and regulations as may be prescribed, for any citizen of the United States or any American vessel to proceed into or through any such combat area.

* * * * *

In case of the violation of this section by any citizen traveling as a passenger, such passenger may be fined not more than $10,000 or imprisoned for not more than two years, or both.

* ' * * * *

The President may, from time to time, promulgate such rules and regulations, not inconsistent with law, as may be necessary and proper to carry out any of the provisions of this joint resolution; and he may exercise any power or authority conferred on him by this joint resolution through such officer or officers, or agency or agencies, as he shall direct."

See also the Act of February 4, 1815, 3 Stat. 195, 199–200 (prohibiting travel to Canada and other British Possessions during the war of 1812).

69. Sections 2 (prohibiting commerce with States engaged in armed conflict), 3 (prohibiting travel in combat areas) and 6 (prohibiting the arming of merchant vessels) were repealed by joint resolution on November 17, 1941, 55 Stat. 764. The legislative history of this repealer statute would give no support to an argument that these sections of the said act were repealed because it was felt that the Act of June 21, 1941, covered the same subject. See e. g., 87 Cong.Rec. 7958 (1941); Statement of the Secretary of State before the Committee on Foreign Affairs, House of Representatives, reprinted at 36 Am.J.Int'l L. 118–121 (1942).